John Tobias Munday and Reuben P. Munday, Appellants, v. Thomas R. Knox.—18 S. W. (2d) 487.

Division One, July 30, 1929.

412

*R. M. Sheppard, Frank Williams* and *Neale & Newman* for appellants.

*William B. Skinner, Mann & Mann* and *Robert Stemmons* for respondent.

ELLISON, C.—This is a suit in equity to set aside two deeds executed by Tobias Henson, deceased, to Thomas R. Knox, on the ground of mental incapacity and undue influence growing out of the physical and mental infirmities of the grantor, an aged man, and a confidential. relation existing between them.

By the first deed, dated December 6, 1919, the deceased conveyed to Knox 505 acres of land in Lawrence County for an expressed consideration of one dollar, love and affection and other consid-erations, and by the second, dated June 23, 1921, 160 acres in the same county, reserving a life estate, in consideration of love and affection and on certain other expressed special considerations. On change of venue the cause was tried by Hon. Warren L. White, one of the circuit judges of Greene County, and resulted in a decree sustaining the deeds, from which the plaintiffs have appealed.

On the day the second deed was executed the deceased also made a will. The appellants in this suit brought an action to contest the will on the same grounds, mental incapacity and undue influence, on December 4, 1923, the same day this suit was filed. The will case, likewise, was tried in Judge White's court on change of venue, and was submitted by the court to the jury on the sole issue of undue influence. Eleven of the jurors returned a verdict overturning the will on June 1, 1925. (The judgment on that verdict was affirmed by Division Two of this court, as reported in Munday v. Knox, 321 Mo. 168, 9 S. W. (2d) 960.) When the instant case was later tried in November, 1925, the appellants offered in evidence a tran-scrip of the pleadings, instructions, verdict and judgment in the will case. This evidence was rejected by the chancellor, but the appellants then made an offer of proof and have preserved these papers in the record; and they now contend we are bound to take cognizance of these former proceedings, because the judgment in

the will case operated as an estoppel by verdict in this proceeding under the doctrine of *res judicata,* touching the controlling issue of undue influence, with respect to both deeds, and if not that, certainly as to the deed executed the day the will was written. Aside from that the decision in the will case should be read in connection with this as bearing on the facts. Some twenty-nine of the witnesses in this case also testified as witnesses in that.

The grantor was about eighty-two years old when he died on November 11, 1923, and consequently about seventy-eight years old when he made the first deed attacked, and well over eighty when he made the second deed and the will. He and his brother John, who was six years older, and their sister Polly had lived together in Lawrence County since the early '60's. Neither had ever married. There was another sister, deceased years before unmarried, and still another who married and died leaving a son, Reuben Munday, and a grandson, John Tobias Munday, who was named for his two great uncles. These two are the plaintiffs and appellants.

The Henson brothers were thrifty farmers and in the course of their lives accumulated nearly 1800 acres of land and about $13,000 in personal property, as shown by the probate inventory at the time of John's death in May, 1919. Their business was conducted as a partnership in the name of J. & T. Henson, and in 1906 they made identical reciprocal wills, each leaving all his property to the other and enjoining that adequate provision be made for a comfortable home and liberal maintenance for Polly. The wills further recited that inasmuch as the three had made their property together nothing was devised to "others who would be my heirs at law." Under John's will all the foregoing property passed to Tobias.

During their closing years both brothers and the sister were sick and infirm. According to one witness Polly Henson was broken in strength for the last twelve years of her life. At first she resorted to a crutch, then to a wheeled chair and finally was bedfast, requiring personal attention. She had inflammatory rheumatism and was paralyzed. Dr. Knapp, the family physician, said she recovered some from the rheumatism, but in 1905, '6 or '7 got down again, had some sort of spasms and was helpless for the rest of her life. John Henson was confined to the house and later to his bed for two or three years before he died, and Tobias, the grantor in this case, was invalided for about the same period, the last year being in bed most of the time according to Dr. Knapp. He had palsy, stiffening of the joints, a bad foot, and suffered a stroke of paralysis in March before his death in November. The witnesses vary in their estimates of the duration of the decline and last sickness of each of the three Hensons, but the record is clear that they were all helpless and bed-

ridden for a greater or less period of time and that the care of them was an exacting service.

The appellant Tom Knox was not related to the Hensons. He came over from north Ireland in 1887 when about six or seven years old, with his mother and five of her nine children. Three of the children had preceded her, among them being his elder sister Lizzie who went to work for the Henson family in 1885. She remained there thirty-eight years, until the death of the last survivor, Tobias. In the earlier years she assisted Polly, who was housekeeper, but when Polly's health and strength began to break she took on new responsibilities and finally had charge of the home and nursed the three Hensons through their last years of physical dependence. Other women were brought in from time to time, one for more than four years, but they were helpers and Lizzie was manager; and a man nurse was employed for the last eight months of Tobias's life, after he had the paralytic stroke. For the first twenty-five or thirty years of Lizzie's service they paid her $1.50 per week and for the next eight or ten years two dollars, and let her keep chickens and turkeys. Toward the last they paid her nothing—as wages.

Tom Knox's mother went direct to Lawrence County when she came to this country and entered the home of Wilson Henson, who was an uncle of John, Tobias and Polly. Wilson Henson lived about a mile from the Henson brothers. Young Tom would go to see Lizzie at Henson brothers' home and so would their mother. Lizzie testified that John asked the mother to let him adopt Tom, and she said she had no children to give away, but finally consented to let him stay on condition that he should not use tobacco, swear or drink whiskey. At any rate he did stay from the time he was six or seven years old, a period of thirty-six years, until the death of Tobias. During all those years, according to a part of the testimony, he received nothing as wages, though the evidence shows his entire time was devoted to farming enterprises of the Henson brothers. According to other evidence he was paid $15 per month after he became twenty-one. In either event, however, it was shown that he accumulated some 200 acres of land before John died in 1919, and forty-nine acres afterward, and the inference drawn by appellants is that he was profiting by the relation he sustained. Of this we shall speak later.

There was testimony on the general proposition that while John Henson was alive his was the dominating spirit in the partnership operations of J. & T. Henson, and that Tobias was more of an outside man—a manual worker; but there is also evidence—quite as much—that the two brothers consulted each other and worked in harmony, and that Tobias did most of the figuring in settling for labor, grain,

etc. After John's death in 1919 the evidence for appellant is that Tom Knox succeeded John as the active man in the farming and stock enterprises, and that Tobias would weakly defer to his judgment and wishes. On the other hand there is much evidence for respondents —we think enough to preponderate—that while Tobias Henson's age and physical condition prevented him from taking a prominent part in the operations, still he was consulted by Tom and whenever he took a positive position on any question of policy he controlled. This testimony comes from men who worked on the farm, from neighbors and business men in Mt. Vernon, the county seat and nearest town.

But to get at the facts in more detail. When John Henson died in May, 1919, Tobias was appointed executor. He was also, as has been said, sole beneficiary under the will. Administration of the estate required the usual steps in the probate court and involved incidental banking transactions. The probate judge testified that whenever Tobias came to the court Tom always came with him, that Tobias usually referred questions to Tom, and that Tom drew the bank checks paid into court during the administration. In addition to this, the bookkeeper of the bank testified that Tom drew most of the checks written for a year or two before John's death, and thereafter until Tobias died, and also made most of the bank deposits. Tobias seldom went to the bank after John's death.

As bearing on these matters, and showing the dependence of the Hensons on Tom Knox and the confidential relation between him and Tobias, the following specific facts were brought out by appellants. When John died there was about $4700 to the credit of the partnership bank account of J. & T. Henson. Early the next month, this amount was transferred to a new account opened in the name of Tobias Henson, executor. The check by which it was done was signed by Tobe Henson, by mark, and witnessed by Tom Knox. About a month later John's funeral expenses of $520 were paid out of this account, and the check was signed "Tobias Henson Ex by Tom Knox." On December 2 the 1919 taxes were paid, amounting to $1034. That check, likewise, was signed "Tobias Henson Ex by Tom Knox." Three days later on December 5, 1919, the balance on hand, $3122.97, was transferred to a partnership account styled Henson & Knox, and the check by which it was done was signed by Tom Knox in the same way as the two others just mentioned.

Going back a little. During the period referred to in the preceding paragraph, on October 8, 1919, just about five months after John Henson's death, Tobias and Tom Knox entered into a partnership contract for farming and stock raising on the land of both, each reserving the exclusive title to his own real estate and assuming responsibility for the taxes thereon, but contributing the use thereof

to the partnership. It was recited the headquarters were to be at the home of Tobias Henson and that each party should have full access to the books and accounts; that Tom Knox should be the manager, look after all details, keep the books, and perform or employ the labor; that no labor or personal care or attention should be required of Tobias Henson. And finally, it was stipulated that the agreement should remain in force during the lives of the parties and that on the death of either the survivor should own the entire partnership assets. Each partner was to have half the profits and be responsible for half the debts. This contract was written by and in the office of Mr. A. L. Sims, a lawyer in Mt. Vernon, and was witnessed by him and a man named Silverwood. Both testified, but nothing either said throws much light on how the contract came to be written. Either Mr. Sims or Tom Knox called Silverwood up from the street and asked him to sign as a witness.

It was to the bank account of this new partnership that the $3122.97 balance in the executor's account was transferred by check dated December 5, 1919, as hereinbefore recited. That check was credited to the former account and charged to the latter the next day, December 6, 1919, closing it. The partnership account of Henson & Knox was opened this same day, starting with a balance of $4122.97, being the $3122.97 taken over from the executor's account, plus $1000 obtained from some other source not shown by the evidence. On this same day, also, a check for $3477.81 was drawn against the partnership account to pay the state inheritance tax due out of John's estate. This check, likewise, was drawn by Tom Knox, being signed "Henson & Knox by Tom Knox." The evidence as to this last mentioned check does not indicate that Knox derived any financial advantage from having the estate funds made over to the partnership, because the inheritance tax check was for more than $350 in excess of the amount received from the estate, but it shows a very close and intimate business relation between the two men.

On this same eventful day, December 6, 1919, the first of the two deeds attacked in this case was written. The circumstances attending its execution were detailed in the evidence for respondents. We shall refer to them later. The deed conveyed to Tom Knox 505 acres of land in two tracts. One was known as the Stahl Creek farm containing 330 acres. This farm had fair improvements, a pretty good house, a good barn and about 180 acres in cultivation. It was worth about $100 per acre according to the evidence of John Henson and John Orr, witnesses for appellants. (This John Henson was a second cousin of the Henson brothers, and is not to be confused with Tobias Henson's *brother* John). The other tract was 175 acres of pasture about a mile east, fenced, but otherwise unimproved. The two witnesses just mentioned said this land was worth $50 per acre.

On the same day and occasion Tobias Henson executed a deed to Tom's sister Lizzie Knox for a like consideration of one dollar, love and affection and other considerations, conveying to her 320 acres of land, reserving a life estate. This land included the Henson homestead of 160 acres with its improvements, which was worth $100 per acre, appellant's witnesses said. This deed to Lizzie, however, is not attacked in this suit, and never has been so far as this record shows. Both deeds were recorded the day they were executed.

About eleven months thereafter, on October 9, 1920, the appellant Reuben Munday filed an information in the Probate Court of Lawrence County charging that Tobias Henson was so unsound of mind as to be incapable of managing his own affairs and that he had attempted to deed away large tracts of land and to dispose of a large amount of his personal property. An inquisition was held and Tobias Henson appeared and testified at length. Following the hearing the information was withdrawn by Reuben Munday, through his attorney, Mr. McPherson.

Something like seven months later, on June 23, 1921, Tobias Henson executed the second deed complained of, reserving a life estate. It covers about 160 acres of land known as the graveyard farm, situated some four miles southeast of the Stahl creek farm previously deeded to Knox. A burial ground had been cut therefrom and deeded to the county court "in trust for a family burial ground for the Henson family and friends." About eighty or ninety acres of the land were in cultivation, and according to appellants' witness John Henson the farm was worth around $75 per acre; their other witness, John Orr, said $90 per acre. The deed recited it was made "in consideration of the love and affection which the said Tobias Henson has for the said Thomas R. Knox—whom he considers his best friend, this deed being in the nature of a gift." It further provided that as an additional and special consideration the grantee, "his heirs, administrators, assigns, legal representatives, grantees and successors shall and will at all times keep in good state of repair the burial grounds" aforesaid and that "the estate hereby conveyed is now and forever burdened with the proper care and attention to the said family burial grounds." Following that were specific directions as to maintenance of fences, ornamental shrubbery, cultivation, cutting weeds and moving, care of monuments and prevention of trespassing and burial by unauthorized persons.

On the previous day, June 22, Tobias had received from Lizzie Knox a deed conveying back to him the east 160 acres of the 320 acres he had deeded her on December 6, 1919, and in exchange therefor he conveyed to her on this day a tract variously spoken of as containing 150 acres or 160 acres, lying immediately south of her remaining 160 acres, giving her a tract of 310 to 320 acres with a

frontage of about a mile on the state highway. The expressed consideration was one dollar, exchange of lands and other good and valuable considerations, and a life estate was reserved. The appellants' witness John Henson said Lizzie got the best of the bargain to the amount of $25 or $35 per acre; that the east 160 acres she relinquished was worth only $40 or $50 per acre, whereas the south 160 acres she received was worth $75 per acre, and as much as $100 per acre in connection with the home place which it adjoined and which Lizzie already had. Such we understand to be substantially the estimate also of the appellants' witness John Orr. This conveyance to Lizzie Knox, like the one made on December 6, is not attacked.

On the same day, June 23, 1921, Tobias executed a deed to the appellant John Tobias Munday "in consideration of the love and affection which the said Tobias Henson has for the said John Tobias Munday, who is his grandnephew. This deed being made in the nature of a gift. . . ." The land conveyed consisted of two tracts, one of 360 acres lying immediately east of Lizzie Knox's land, which included the 160 acres she retransferred to Tobias; and the other being eighty acres a mile further south. There were no improvements on either tract. About fifty or sixty acres of the 360 acres were in cultivation, and the rest was in timber. The whole tract was worth about $40 per acre. John Henson testified as a witness for appellants. If the appellants' witnesses gave the value of the eighty-acre tract on south a mile we do not identify it by their references to it. It was, however, within two miles of Mt. Vernon—closer than any of the other land. The deed reserved a life estate and recited that John Tobias Munday, the grantee, was a minor and forbid the sale or encumbrance of the land conveyed or the subjection thereof to his debts until he should reach the age of thirty years. He was then nineteen years old.

Likewise on the same day Tobias deeded forty acres to the appellant Reuben Munday, reserving a life estate. The consideration was "love and affection which the said Tobias Henson has for the said Reuben P. Munday who is his nephew, this deed being in the nature of a gift." The forty-acre tract conveyed to Reuben adjoined the extreme south part of John Tobias Munday's land, and we understand from the record was of about the same kind and value.

All four of these deeds were written by Mr. Sims, an attorney at Mt. Vernon, on June 23, 1921, and all were recorded that day at about eleven A. M., the deeds to the appellants John Tobias Munday and Reuben Munday being placed of record without actual delivery to them and without their knowledge. On cross-examination, however, John Tobias Munday admitted that after the death of Tobias

he entered into possession of the land deeded to him and had rented part of it and cut timber from it.

On the same occasion Mr. Sims wrote Tobias Henson's will. The will was signed in triplicate and gave to the appellant Reuben Munday one dollar, and to the appellant John Tobias Munday for life, remainder to the heirs of his body, 200 acres of land across the road and about one-fourth mile southwest of the Henson homestead. In default of his issue the remainder was to go to Lizzie Knox. The land had no buildings, but 120 acres of it was in cultivation, and according to the appellants' witnesses John Henson and John Orr it was worth about $50 per acre. The will also devised to John Tobias Munday and to Tom Knox 120 acres about one-half mile northwest of the Henson homestead. They were to take it as a "partnership" or as joint owners, the survivor succeeding to the whole title. This was unimproved prairie land and the appellants say it was worth $50 to $75 per acre.

The will appointed Tom Knox "whom I consider my best friend," executor without bond, and gave him the residuary estate. Whether anything of value passed under the residuary clause is not clear. As we understand the record all of Tobias Henson's land had been deeded away by the deeds heretofore mentioned except the two tracts specifically devised by the will, and his bank account had been transferred to the Henson & Knox partnership as hereinbefore recited. The inventory of John Henson's estate, however, showed over $2700 in securities and notes and more than $5150 in household goods, grain, livestock and farm implements. Very likely these latter went into the partnership, but the facts are not made clear by the record.

In addition to the foregoing some of the appellants' witnesses testified to conversations with Tobias Henson they had had or heard. J. E. Brown worked on the Henson place from February, 1918, to October, 1919, and lived there part of that time. He said he heard Tom Knox remark to John and Tobias Henson once or twice that John Tobias Munday wouldn't work like he should and wouldn't save his money. This was during the threshing season and young Tobe had been over stacking wheat. But on cross-examination it was developed that the statement was uttered while they were in general conversation in the house and that he (the witness) made similar criticism of his own boy; that they were talking about boys going to shows and spending money. This witness also said that on one occasion after John's death he passed the window of a room where Tobias, Tom Knox and Lizzie were. Tobias had his handkerchief to his face and Lizzie said, "If you don't do as we say we will leave." Lizzie denied this on the stand, and it was shown that

the witness had quit his employment at the Henson place because of a difference with Tom over wages.

John Henson (the cousin) testified that on October 22, 1919, he went to Henson brothers' home to settle for some wheat due Tobias from land rented on grain rent. This was after John's death, and just two weeks after the partnership agreement had been made. The witness asked Tom to write the check. Tom asked Tobias how the check should be made out, to Henson & Knox or to Tobias Henson. Tobias answered, "Write it to whoever you please," and Tom inserted the name of Tobias as payee. But, the witness continued, in connection with the writing of the check, and while Tom was still present in the room, Tobias said to him (the witness), "I have to sweeten them to keep them with me;" and when the check came back to him through the bank it bore the indorsement of Tobias Henson *in Tom's handwriting*. So far as this evidence tends to show Tobias's dependence on Tom it may have some probative value, but if the inference sought to be drawn is that Tom got the money we think appellants are mistaken, for we find the amount credited to Tobias Henson's bank account as *executor* five days later on October 27.

This witness further stated that after their business transaction had been completed Tobias said he wanted to go to Mt. Vernon to fix up his business; that he wanted Tom and Lizzie to live on the home place as long as they wanted to and then he wanted it to go to the kinfolks. Then he added: "They don't want it to go that way, they want it to go to their folks," but "I don't think that's right." Tears were rolling down his cheeks as he was talking. The witness said his sister Carmen was in the room when this occurred, and that he later told his father and others about it. Carmen Henson was put on the stand by respondents. She denied being present during any such conversation, but said it was true that sometime later her brother John Henson narrated the incident to her father and wanted her to confirm it and when she refused he didn't like it. Their father was dead at the time of the trial. For appellants it was brought out on cross-examination of Carmen Henson that since January, 1924, she and her sister had been living with Tom and Lizzie Knox as members of their family, receiving no wages, but getting their board, room and clothes and keeping ten head of livestock without charge.

Mrs. Mattie Munday, mother of the appellant John Tobias Munday, testified that soon after her husband died in January, 1919, she was at the Henson home and John Henson told her in the presence of Tobias not to skimp to save for young Tobe, that they had meant for her husband, Sherman Munday, to have the bulk of their property, but now that he was dead they intended for John Tobias to have it. She said on another occasion about two years before her husband died John Henson told them that Tom Knox wanted to buy the Stahl

Creek farm, but that they were not going to sell it to him; that Tobias and he had already given him 300 acres and if he couldn't make a living on that he couldn't with more; and John added, "I think we have done a good part by him," following which he addressed her husband, Sherman Munday, saying, "Of course, we intend for you to have the bulk of it after we are gone."

There was also a considerable volume of testimony concerning statements made by the respondent Tom Knox, and as to his acts and conduct. The appellant John Tobias Munday said—and in this he was corroborated by his mother—that while the inquisition on Tobias Henson's sanity was pending Tom Knox told him to stay by Uncle Tobe and he would come out all right; that Tobias was going to remember him well if he stood loyal and would give him most of his property that was left, about 900 acres. After John Tobias employed an attorney Tom asked him several times why he wanted a lawyer and said he had no business with one.

Mrs. Munday further said after the death of Uncle Tobe she was talking to Tom Knox about the land deeded to young Tobe in the deed of December 6, 1919, and complained there was so much timber land it wouldn't pay the taxes. Tom answered: "We give Tobe a good deal of good land in the will." On another occasion shortly after John Henson died in May, 1919, Tom told her "they," meaning John and Tobias Henson, wanted young Tobe to straighten up and be a man; that they wanted him to have most of what they had. Later Tom told her he was trying to get Uncle Tobe to fix up his business and that he (Tom) had asked him (Tobias) to make him an equal heir with little Tobe and Uncle Tobe said he would. Tom said he wanted what he got deeded to him because a will might be broken. After she heard about the will and deed of June 23, 1921, but before Tobias had passed on, she was talking to Tom and he said for her and little Tobe to come over and he would show them the will and deed, and if they were satisfied they could fix up some papers. They went over and stayed all day, but Tom, who was at home when they got there, left and remained away. Tobias Henson, she says, didn't bring up the subject. During the last week of Uncle Tobe's sickness she stayed at his home and Tom told her several times he would show her the will and the deeds, but he didn't do it until after Uncle Tobe died. When she read the will she saw that if young Tobe died without issue the 200 acres devised to him would go to Lizzie Knox and not to her, and Tom Knox told her she was mistaken, saying, "That don't mean you," and that if young Tobe died childless she would get the land.

Ben Baker, who was a friend of John Tobias Munday, said that about the time of the institution of this litigation, without any previous acquaintance Tom Knox called on him at the store where

he worked in Springfield and asked him to try to get John Tobias's lawyer discharged. Knox said the personal property belonging to the estate only consisted of two or three head of cattle.

John Orr testified that in about 1915 Tom Knox told him he had always desired to own the Stahl Creek farm, but that John Henson "pulled off a stunt you couldn't have made him believe John would have done;" that he was going with a girl against John's wishes, and Polly told him (Tom) John said he wouldn't give him the farm, that "it will go from him to that outfit." Tom said he questioned John about it and John wheeled around and said, "Just where would it go?"

George Grady was a brother of Mrs. Mattie Munday. He said after the will suit and this suit were filed in December, 1923, he talked to Mr. Sims, the lawyer who wrote the will. Sims told him if Lizzie Knox would sign a quit-claim deed to young Tobe Mrs. Munday would get the 200 acres devised to young Tobe, in case he left no lineal descendants. He (Grady) then went to Tom and Lizzie Knox and they said they would sign such a deed if John Tobias would withdraw from the litigation. Thereupon he had Mr. Sims draft a letter to the circuit judge to be signed by John Tobias, stating he had been joined as a plaintiff without his consent. Young Tobe signed and sent the letter, but, the witness continued, Tom and Lizzie never did comply with the agreement—that he knew of.

John Tobias Munday had nothing to do with the insanity inquisition instituted by Reuben Munday, and the evidence is clear, we think, that John and Tobias Henson were always on friendly terms with him and his mother, and his father Sherman Munday. The two families lived within about two miles of each other for years and were neighborly, and when Sherman Munday died the funeral was held at the Henson home at John Henson's request. The Henson brothers paid $400 toward squaring up the funeral expenses, etc., and later, in 1922, when young Tobe broke his leg Tobias Henson had Tom Knox pay the medical expense, amounting to $209, though this money was obtained by cutting walnut logs off the land deeded to young Tobe by the deed of June 23, 1921. Mrs. Munday said Tom told her he could have persuaded Uncle Tobe to cut off all the timber during the continuance of his life estate. She also testified that some years back John Henson traded for a twenty-two-acre half interest in a tract left by Sherman Munday's mother (John's sister) and deeded it to young Tobe. At the time of the trial below John Tobias Munday was a sophomore in the Southwest Missouri State Teachers' College at Springfield. There was no evidence that he was dissolute or extravagant, and it was disclosed by the testimony that his mother had gone there with him for a time and taken in washings—for one family, at least.

As indicating that Tom Knox profited by the relation he sustained to the Henson brothers through the years, the appellants showed that between August 5, 1911, and July 23, 1912, he had an active individual bank account which stood pretty steadily around $700. On August 10, 1912, he again opened an account of $21.35, but drew it out the same day. On December 13, 1912, he started a new account which ran with a small balance to January 4, 1913, when it was closed. On March 13, 1913, he opened an account carrying a balance exceeding $1100 until May 31, when it was withdrawn. On September 13, 1913, he deposited and drew out $800. Between December 6, 1913 and February 7, 1914, he kept an account ranging progressively downward from about $600 to $250 when it was closed. Thence there was a period of about two years when he had no account. On March 13, 1916, he opened a small account which ran to August 30. Then three years elapsed. On November 15, 1919, he put $100 in the bank and drew it out on November 22. Following that was a gap of four years. On December 5, 1923 (after Tobias's death on November 11), he opened an account with $1200 borrowed from the bank and this account continued active until the time of the trial in November, 1925. The balance never exceeded $1300, except one day when it was a little over $1600.

It was also shown from the land records that Tom bought seventy-five acres of Morgan land, immediately adjoining the Henson homestead on the north, for $1800 on October 3, 1903, and there was testimony this was a gift from the Henson brothers made when he attained his majority, though there was evidence to the contrary from appellants' own witnesses. On September 30, 1916, he bought an isolated forty acres south of the Henson farm from John and Tobias Henson for $1000. March 12, 1919 (about a month before John died), he bought from Norman E. Smith and wife eighty acres fitting into a corner of the graveyard farm (later deeded to him by Tobias on June 23, 1921) for $3800. And finally on February 16, 1920, after John's death, he bought forty-nine acres for $3500, the tract adjoining the Stahl Creek farm for which he already had the deed from Tobias Henson dated December 6, 1919.

So much for the appellants' evidence. There were twenty-six witnesses for respondent. Most of them were persons who had worked for Henson brothers, people who owned adjoining land or land in the neighborhood, and who had been in the home especially during the latter years of Uncle Tobe's life, three doctors who examined him for a pension, one of them being his family physician, the lawyer who wrote the deeds of December 6, 1919, and the witnesses thereto, the lawyer who wrote the will and deeds of June 23, 1921, and the witnesses thereto. The respondent made a strong case, but we shall only attempt to sketch the testimony.

There were a number of witnesses who described the helpless condition, in turn, of the three old people, the exacting care given them by Lizzie Knox and how Tom Knox ran the extensive farming enterprises as active manager, all living as in one family. A number of the witnesses said Tobias Henson was a man of strong convictions, hard to influence, and that his mind was good up to the end, barring whatever detrimental effect may have resulted from the paralytic stroke he suffered. Dr. Shelton described him as a large raw-boned man, mentally slow and steady and not much given to airing his views.

As to statements made by Tobias Henson, or by John in his presence, Wm. Cherry testified he heard them say he intended to take care of Tom and Lizzie Knox. Luther Turk stated Tobias declared after John's death he couldn't do without Tom and Lizzie, and that "they took care of them just as well as if they had been their own parents, couldn't have taken care of them any better." And on another occasion said: "I have done just as near like John wanted me to do as I know now." George Overalls, a farm laborer, swore that sometime after August, 1922, while he was working at the Henson place, Tobias said "he had fixed it (his property) like him and John planned it." Mrs. G. L. Knapp, wife of Dr. Knapp, the family physician and friend of the Hensons, said that about a year before his death Uncle Tobe told her "he didn't think he was able to pay them (Tom and Lizzie) for the care they had given him." Another witness, J. C. Lester, had worked for the Henson brothers for a period of eight years, ending about seven years before the trial below. He said one day Tom wanted to buy eighty acres of land and John objected, saying, "We have got more land than we need now;" and then he added, speaking to the witness, "Me and Tobe mean to leave him so he can handle stock if he wants to."

Mr. H. S. Fowler was a hardware merchant sixty-seven years old living in Mt. Vernon. The Henson brothers traded at his store, and he had known them intimately and visited in their home for years. He said on a certain occasion in his store John and Tobias stated they were going to take care of Tom and Lizzie; and they also mentioned the Stahl Creek farm, and John said he had bought it for Tom. After John's death Tobias said he was going to carry out John's wishes exactly, and give Tom the Stahl Creek farm. Still later he stated he wanted to give Tom the graveyard farm, that Tom would look after the cemetery, keep it up. This witness admitted he had $1,000 loaned to Tom Knox at the time of the trial.

Lon Raden said that in about 1910 he was at the Henson place seeing about some stock. As he talked to John and Tobias Henson Tom Knox passed them. Mr. Raden inquired who he was and the Hensons answered it was a boy working for them whom they had taken to raise. Being asked if he was a good boy they said "Yes,

we allow to give him this place here when we get through with it, providing he will stay with us and live a single life.'' On cross-examination appellants brought out that at that time Tom was a man thirty years old and not a boy, and that he had been living there in the same general neighborhood with the witness for years.

William T. Eubanks told of an occasion in about 1898 when he was threshing at the Henson place and the straw stack caught fire. Reuben Munday bunglingly tipped the top of the stack into the fire and made it worse. John Henson was angry and said he had paid out $1800 to keep Reuben out of jail and that he wasn't going to leave him anything, to which Tobias agreed. It had previously been shown by appellants that one time in his earlier life Reuben had been prosecuted for some criminal offense, but was acquitted.

I. G. Jennings, seventy-five years old, was a second cousin of the Henson brothers. He was the nurse employed to care for Tobias from the time of his paralytic stroke in March, 1923, on to his death the following November. He says one day Tobias told him to ''bring a chair and sit here, I want to talk to you.'' Then Tobias continued: ''I tell you what I want, I want Lib (that is what he called Lizzie)—I want her to have everything in this house and every foot of land I have given her. She has been here thirty-seven or thirty-eight years and helped us make what we got, done our washing, cooking, sewing, waited on Polly while she was sick. After John got down, waited on him and broke herself down, and I want her to have everything I have given her.'' Further, he said: ''The understanding between me and John was if John died first everything went to me and if I died before John everything went to him; and I fixed it just like John would have fixed it if he had been here in my place.'' During his last illness Tobias also spoke to this witness about Reuben Munday. He said: ''I reckon Rube won't come over and see us; no, he won't come over; he got into that case and cost me and John a sight of money and he won't come.''

Dr. G. L. Knapp was an intimate friend of the Henson family and had been their family physician for over fifty years. He said about a year or two before Tobias Henson died he told him (Dr. Knapp) that he and John had made a ''joint'' will whereby each left all of his property to the other, and they had an understanding as to how the survivor would dispose of it, though Tobias didn't tell the Doctor what that understanding was. He did say they were not going to give Reuben Henson much, that he didn't deserve it, that they had spent a large amount of money keeping him out of the penitentiary, and that if he got property ''he would soon swallow it.'' This was before Tobias Henson's will was written.

Regarding the execution of the deeds and will. The judge of the Twenty-fourth Judicial Circuit at the time was Judge Charles

L. Henson of Mt. Vernon. Up to 1917 he had been a practicing lawyer in that city. His partner, Mr. Brumbeck, drafted the reciprocal wills written by John and Tobias in 1906. They were clients of the office. In about 1910 they had a claim against an elevator company for some wheat. Tom Knox had a smaller similar claim. The question came up as to whether the two claims should be consolidated or handled separately. Tobias said it would not make any difference as it was their purpose to give Tom and Lizzie substantially all their property anyway. Early in December, 1919, Tobias Henson came to Judge Henson's office in the court house at Mt. Vernon and requested him to write his will and some deeds. (Judge Henson and Tobias were not related.) Judge Henson declined, because he was then on the bench. Notwithstanding, Tobias remained there and chatted and said he wanted to give his property in the main to Lizzie and Tom Knox; that John was dead and he wanted to go ahead and make the property practically all over to Tom and Lizzie except some he wanted to give to little Tobe. He said Lizzie had been there a long time and had looked after them and waited on Polly in her lifetime and spoke of the service she had done in and about the place, and that Tom had been a good boy—had served them there a long time, and that he felt like they were deserving of all he had.

He said, also, that he didn't want to give Reuben Munday anything; that he would run through with it, and it wouldn't do him any good, and that he (Tobias) had spent some money on him back yonder a number of years. When Judge Henson refused to draw the will and deeds Tobias said he would get Joe Manlove to do it. Mr. Manlove had been Judge Henson's predecessor in the office with Mr. Brumback, and at the time of the conversation was practicing law at Pierce City. A few days later Mr. Manlove called at Judge Henson's office on the way out to Tobias Henson's home to write the papers.

At the time of the trial Mr. Manlove was Congressman representing the 15th district. He testified Mr. Fowler, the hardware merchant of Mt. Vernon previously mentioned, called him on the telephone at Pierce City on or about December 6, 1919, and told him Tobias Henson wanted him to draw his will and some deeds. (Mr. Fowler testified he did this at Uncle Tobe's request.) Mr. Manlove drove through Mt. Vernon, picked up Mr. Fowler and Mr. Maberry, vice-president of the Farmers Bank, and went out to the Henson place. When they got there Uncle Tobe gave instructions as to the drawing of the deeds to Tom and Lizzie Knox heretofore described, dated December 6, 1919. Mr. Manlove and Mr. Maberry got the description of the lands from a plat book they had taken with them. After the deeds were prepared it was found no

one in the party was a notary public, so Mr. Manlove went back to Mt. Vernon and got Walker Davis, the circuit clerk. He took the acknowledgments. Then Tom and Lizzie were called into the room and Uncle Tobe delivered to each the deed for him or her. Lizzie cried and Uncle Tobe said, "You needn't cry; if I didn't want to do this, I wouldn't, and you have well earned it and more too." Tom said, "Are you sure you want to do this, Uncle Tobe?" and Tobias answered, "I have done it on my own account."

Then Tobias told Mr. Manlove he wanted him to draw his will dividing the remainder of his property between Tom and Lizzie except eighty acres of timber land which was to go to young Tobe. Mr. Manlove replied: "I told him I wouldn't want to draw that will; that I thought he ought to take care of his blood kin; that I thought if he wanted to do that he had better get somebody else." And so the will was not written that day. This testimony was corrborated more or less closely by Mr. Fowler and Mr. Maberry, witnesses to the deeds, and by Mr. Davis, who took the acknowledgments, except as to the part about Mr. Manlove's refusing to write the will. They were not asked about that by respondent's counsel, and they were not cross-examined by appellants' counsel even concerning the execution of the deeds.

Time ran on until June, 1921. In the meantime the insanity inquisition had been held in November, 1920. On June 23, Tobias Henson was ordered from Washington to appear before the Federal Pension Examining Board at Mt. Vernon in connection with his application for an increase in pension from $50 to $72 on account of physical disability requiring nursing by way of physical assistance. Tom Knox brought him in. This board was composed of Dr. Townsend, Dr. Shelton and Dr. Knapp, all of whom testified. Tobias was so feeble he was unable to get upstairs to Dr. Knapp's office where the board was meeting, and so was taken to Dr. Shelton's office instead, it being on the ground floor. The increase was recommended. The doctors all testified his mind was clear, and Dr. Knapp said they were particularly careful in noting his mental condition, because a lawyer had previously talked to him (Dr. Knapp) on the subject. This lawyer said there would be trouble over the estate, and contemplated attacking the conveyances theretofore made. Dr. Knapp acquainted the other doctors with these facts. Two of these doctors again saw Tobias at his home in January, 1922, and the third physician visited him in 1923, some few weeks before he died. They all expressed the opinion that he was normal mentally.

But to get back to the examination. One of the doctors said while Uncle Tobe was in the office he gave Tom Knox some directions about some matter in which he was interested and Tom left. Now, on that same morning, according to the testimony of Mr. Arch

L. Sims a farm loan agent and lawyer at Mt. Vernon, Tobias Henson sent word to him that he wanted him to prepare his will and some deeds. Mr. Sims could not recall who gave him the message. In fact, he says when he received it he first started to go out to the Henson home, but in some way learned Uncle Tobe was then in town at Dr. Shelton's office. He went over there. Uncle Tobe was alone. He told Sims he was there under the observation of the doctors and that he wanted his will written ''if the doctors thought I had sense enough to write one.'' Mr. Sims took notes and went back to his office and wrote the will and the deeds hereinbefore summarized, the deed for 160 acres to Lizzie Knox, the deed for the 160-acre grave-yard farm to Tom Knox, the deed for the 440 acres to John Tobias Munday and the deed for forty acres to Reuben Munday. The instruments having been prepared, he took them by appointment to Mr. Fowler's hardware store, and spent an hour or more with Uncle Tobe reading and checking them over. Then Mr. Fowler and Mr. Maberry were called and they and Mr. Sims attested the will and deeds as witnesses—there were three witnesses. All testified Tobias was of sound mind at the time, but none of them were asked, nor did they tell, anything he said in explanation of the instruments—his reasons for making them.

On one point Mr. Sims was pressed on cross-examination and his explanation was not entirely clear. It will be remembered the deed Tobias made Lizzie Knox on the occasion above referred to conveyed to her 160 acres of land in exchange for a like acreage she had deed-ed back to him the day before, June 22. This latter deed also was prepared by Mr. Sims and acknowledged before him. The deed from Lizzie being in execution of a contract of exchange it is evident the deed *to* her must have been in contemplation when the former was made on June 22. And yet Mr. Sims's testimony ran as if he was not notified until the morning of June 23 that Uncle Tobe wanted him to draw the will and other deeds. He was asked at whose request he drew the deed from Lizzie, and he said Tobias Henson's and then again he said he could not remember. He couldn't recall whether he saw Tobias Henson on June 22, and if so where, but he was certain Lizzie actually came before him that day and made her acknowledgment, and that the arrangement with him was made by Uncle Tobe.

When Tobias Henson was examined in the insanity inquisition Mrs. Katherine Halterman, an attorney in the proceeding, took long-hand notes of his testimony. She was a witness in this case and produced the notes. They cover about three and one-half pages of the printed abstract. Speaking generally the old man's testimony coincides with that of many of his witnesses regarding his business and family relations with Tom and Lizzie Knox and the execution of

the two deeds on December 6, 1919, some ten months before the hearing.

He said after John Henson died Tom and Lizzie Knox remained with him and said nothing to him about wanting an understanding; that "before John died they had promised to stay with us as long as we lived." He continued: "I did not mention to them that I was going to make the deeds to them. Did not say anything to them until I got ready to do it. John and I had agreed Tom should have the Stahl farm, because he was small when he came to us and had been a mighty good boy and we thought he ought to have it. I sent for Manlove over 'phone. Did not tell Tom what I wanted him for. Lizzie did not know I was going to give her the farm until I gave her the deed. Mr. Manlove suggested I reserve life estate, I think. When I gave them the deeds I told them I would keep the land my lifetime." These two deeds of December 6, 1919, did not expressly reserve a life estate in the grantor, it will be remembered.

Then comes a part on which appellants make a point. The old man said (according to the notes): "Can't say how much land in the home place. Eighty where house. Land made to Lizzie is in adjoining section. It is in 6. Mean't to deed her 120 fractional.* Told Mr. Manlove that was what I wanted her to have. Taking in house and the north barn. South barn is on another section. It includes where the house is and a strip north, eighty wide and a mile long, whole half section, that's where it lies." The appellants call attention to the fact that that part of the foregoing quotation preceding the * says Tobias meant to deed Lizzie a fractional 120 acres in Section 6, whereas by the deed of December 6, 1919, she actually got 320 acres, in a rectangular tract a mile long east and west and one-half mile wide north and south, the south half of which was in Section 7 and not in Section 6. But we are of the opinion that it would be unfair to measure the old man's mind by the accuracy in land description of notes hurriedly taken in long-hand while he was on the stand. Besides, Mrs. Halterman testified in this connection that he didn't hear well and that at the place marked by the * there was a recess for the noon hour, at which time his attention was called to the foregoing. When he resumed his testimony in the afternoon he stated he had misunderstood the attorney, and went on to say the tract was a half section, a mile long and "eighty wide," as the notes show.

The notes continue: "Stahl Creek farm does not join but lies north and west of home place. 350 acres. Deeded him the prairie pasture little north and west of that, altogether 507 acres. I had Tom tell Hal Fowler to telephone Manlove to come out. I gave Mr. Manlove description. I told him I wanted that land deeded to Lizzie and I got the tax receipts to show him the numbers. Told him where the

land was I wanted to deed to Tom. Then the question was if any-one there was a notary and no one was, so Joe went and got the Clerk. Someone, I rather think it was Maberry signed my name and held the pen while I made my mark. I couldn't say where Tom and Lizzie were, but they were out of the room. I called them in and gave Tom his and Lizzie hers. Tom said he didn't want me to do it unless I was willing.''

Toward the close the notes state regarding Lizzie's and Tom's wages: ''Lately haven't paid her anything. Never did pay Tom anything. He didn't get part of crops or stock or anything. All he has he made.'' Then he went on to say, speaking of his partnership contract with Tom, ''By contract we go in partnership on stock. When one dies all stock goes to survivor;'' and the last thing in the notes is: ''John told me less than a month before he died that he wanted me to see that Lizzie got the home place.''

By the various deeds and the will Tom Knox got 505 acres verb-ally subject to Tobias Henson's life estate, plus 160 acres expressly subject to the life estate, plus sixty acres (one-half of 120 acres in the will) making 725 acres. Lizzie got 320 acres, of which 160 acres was verbally subject and 160 acres expressly subject to the life estate of Tobias. John Tobias Munday got 440 acres, subject to Tobias's life estate, and also subject to restraints against alienation until he should reach the age of thirty years; and he also got a life estate in 200 acres under the will, with remainder to the heirs of his body, remainder over to Lizzie Knox in default of his issue; and he and Tom together got 120 acres under the will, the survivor to take the whole title. (John Tobias was nineteen years old when the will was made, and Tom Knox about forty.) Counting this as sixty acres John Tobias Munday got 700 acres, or the interests therein above specified. Reuben Munday got forty acres by deed, and nothing un-der the will.

The theory of appellants was that the land conveyed to Lizzie and Tom was more valuable than that given to John Tobias Munday and Reuben. Appellants' evidence as to valuations has heretofore been noted. Undoubtedly it was better located with reference to the state highway, and much of it had building improvements. But there was testimony for respondents that the 505 acres first deeded to Tom, the 320 acres deeded to Lizzie and the 440 acres deeded to John Tobias were not greatly different in value. This came from three witnesses, Wm. Cherry, Luther Turk and J. C. Lester, and was on the theory that the home place Lizzie got was worn and thin, and that young Tobe's land had valuable timber. However, one of these witnesses admitted Lizzie had the advantage to the extent of the buildings, etc., on her land, and our opinion from the whole record is that Tom fared better than young Tobias.

436

I. The appellants' first assignment is that an estoppel by verdict under the doctrine of *res judicata* results from the judgment in the will contest case, and that we must treat the issue of undue influence as conclusively settled in favor of the appellants. The respondents say not: (a) because the will contest case was a proceeding *in rem* and the doctrine of *res judicata* is not applicable thereto for that reason, citing Canty v. Halpin, 294 Mo. 118, 138, 242 S. W. 97, 103; (b) because there was no plea of *res judicata* in the petition or by reply; (c) because the subject-matter in issue was different in the two cases.

On the first proposition, the Canty case was decided in banc but this division departed from it in State ex rel. Gott v. F. & D. Co., 317 Mo. 1078, 1093, 298 S. W. 83, 90, holding that though a suit to contest a will is a proceeding *in rem*, yet it is none the less a proceeding *inter partes* under our statutory scheme, and the judgment therefore is binding on those who participate therein. We remain of the opinion that that conclusion is sound. [3 Freeman on Judgments (5 Ed.) secs. 1524, 1525, pp. 3130-5; 2 Black on Judgments (2 Ed.) sec. 795, p. 1203; 34 C. J. sec. 1173, p. 760; sec. 1290, p. 882.]

On the second proposition. The petition did not plead *res judicata*. The answer contained a general denial and affirmatively alleged the two deeds attacked were voluntarily made for a good and valuable consideration, praying that they be confirmed and upheld. There was no reply. The courts are divided on the question as to whether a former adjudication must be specially pleaded to be a valid defense. [34 C. J. sec. 1491, p. 1055; 15 R. C. L. secs. 524, 525, p. 1045.] This conflict was noted in In re Breck, 252 Mo. 302, 318, 158 S. W. 843, 848, decided in banc, in which it is said, citing three earlier cases, that by the great weight of authority in this State the former judgment may be given in evidence under the general issue. See also Womach v. St. Joseph, 201 Mo. 467, 479, 480, 100 S. W. 443, 10 L. R. A. (N. S.) 140, quoting from the leading case of the Duchess of Kingston. On the other hand there are numerous Missouri decisions holding *res judicata* is an affirmative defense which must be specially pleaded: Lemon v. Garden of Eden Drainage Dist., 310 Mo. 171, 181, 275 S. W. 44, 47; Kilpatrick v. Robert, 278 Mo. 257, 262, 212 S. W. 884, 886; Nelson v. Jones, 245 Mo. 579, 590, 151 S. W. 80, 82; Beattie Mfg. Co. v. Gerardi, 166 Mo. 142, 155, 65 S. W. 1035, 1038; Kelly v. Hurt, 61 Mo. 463, 466; and such is undoubtedly the general rule with reference to estoppel where there is opportunity to plead it. [21 C. J. 1241 et seq.; 10 R. C. L. sec. 148, p. 842; Grafeman Dairy Co. v. Northwestern Bank, 315 Mo. 849, 858, 288 S. W. 359, 362.]

One distinction is made in a number of jurisdictions which the cases in this State ignore, so far as we have been able to find. When the former adjudication is on the same cause of action as that in which the doctrine is invoked there is an estoppel by *judgment* barring the whole action; but when the first judgment was on a different cause of action the estoppel is by *verdict,* as it is called, and is conclusive in the second proceeding only as to material issues of fact actually determined in the former cause. [State ex rel. Gott v. F. & D. Co., supra, 317 Mo. l. c. 1092, 298 S. W. l. c. 87.] These foregoing decisions say that when the estoppel is by judgment it must be pleaded, because it goes to the whole cause of action; but when the two causes of action are different and the estoppel is by verdict, the former adjudication is merely *evidence* on the specific issues covered by it and need not be pleaded any more than any other evidence. [34 C. J. sec. 1491, p. 1055; So. Pac. Ry. Co. v. United States, 168 U. S. 1, 57, 18 S. C. 18, 42 L. Ed. 355; Swank v. St. P. City Ry. Co., 61 Minn. 423, 425, 63 N. W. 1088; Farmers & Fruit Growers' Bank v. Davis, 93 Ore. 655, 664, 184 Pac. 275; Gray v. Linton, 38 Colo. 175, 184, 88 Pac. 749; Krekeler v. Ritter, 62 N. Y. 372, 374.] In some states it is the rule that when the former judgment is specially pleaded as an estoppel it is conclusive, but that even when not pleaded it is admissible in evidence though not conclusive. However, Mr. Greenleaf says that by the weight of authority in the latter instance also the judgment is conclusive. [1 Greenleaf on Evid. (16 Ed.) sec. 531, p. 660.]

As a practical matter, when the former judgment is dispositive of the second cause it is unimportant whether the rule be regarded as operating to bar the action or defense, or merely by way of interposing conclusive evidence on a controlling issue. The result is the same. In this case if it be taken as established the deeds were procured by undue influence of the grantee, that is the end of the matter. Under the later Missouri cases, and logically, we think, the estoppel claimed should have been pleaded, but in view of the respectable authority to the contrary we refrain from deciding the question finally for another reason.

Even where there is an estoppel by verdict the former judgment will not be binding in the second suit on issues growing out of different transactions or states of fact, though they be similar to those involved in the first action. The same precise point or question must be presented in both cases, it has been said. [34 C. J. sec. 1324, p. 914, sec. 1325, p. 919.] The question in the will contest case was whether the will was procured on June 23, 1921, by the undue influence of the respondent Tom Knox. The question in this case is whether the deeds of December 6, 1919, and January 23, 1921, to Tom Knox were procured by his undue influence. Granting for ar-

gument's sake that the respondent has acquired an undue influence over Tobias Henson which operated in the making of his will on June 23, 1921, can we say it conclusively follows that the same influence existed and dictated the making of the first deed on December 6, 1919, nearly eighteen months earlier? Are the issues identical? That they are not seems obvious.

And while the question is closer we think the same should be said of the second deed though it was executed at the same time as the will. The Supreme Court of Iowa had that question before it in Courtney v. Courtney, 149 Iowa, 645, 649, 129 N. W. 52, where it is said:

"Even though the will and deed were executed at the same time, as a part of the same transaction, they were separate papers of different character, took effect at different times, and may well have been preceded by different negotiations. Had probate of the will been denied on the ground of mental unsoundness, a different question would arise, for in that exént, as both were executed at the same time, the disability of deceased must have affected both alike. But the mere fact that defendants had destroyed the free agency of decedent, so that the execution of the will was the result of the dominion of their minds over hers, does not necessarily indicate that a like influence was exerted with respect to the execution of the deed. The deed may have been the outcome of a bargain made long before its execution and upon ample consideration, and its execution at the time but the carrying out of a previous arrangement. Especially might this have been so where the circumstances of executing the deed is merely recited in the will, with the desire expressed that it be given effect, and the will gives the maker's personal property to the grantee and disposes of other real estate to another. That the two papers were executed as a part of the same transaction means no more than that each was a part of the same affair."

Not only are the issues of fact different, but there is nothing in the pleadings, instructions and verdict in the will case showing the jury *determined* the deeds were procured by undue influence, nor was it necessary to a decision of the case. It is conceivable a jury might reject that hypothesis and still say that since Knox had been thus provided for, the will was all the more discriminatory and must have been the product of undue influence. In that event the verdict overturning the will would be based on the validity of the deeds instead of the contrary. We think the doctrine of *res judicata* does not apply.

II. Having reached that conclusion we turn to the merits of the controversy. There was little, if any, evidence of mental incapacity.

The appellants do not seriously controvert that. We think, and hold, further that the evidence shows such a confidential re-lation between Tom Knox and the grantor, Tobias Henson, as raised a presumption of undue influence. On that point we concur in the views expressed by the late lamented HIGBEE, C., author of the opinion in the will case. [Munday v. Knox, 321 Mo. 168, 9 S. W. (2d) l. c. 964.] But our conclusion from the whole record is that the respondent successfully met the issue and that the judgment should be affirmed.

The situation is now different from that presented when the will case was on appeal. The inquiry then was whether substantial evidence supported the verdict. Further than that the court did not and could not inquire and the evidence for the proponent was laid to one side. [Munday v. Knox, 321 Mo. 168, 9 S. W. (2d) l. c. 964.] The instant suit is in equity and we must weigh the evidence of both sides. We think it shows the grantor held Tom Knox and his sister in high regard. He was grateful for their long and faithful service. His statements made at and prior to the execution of the deeds disclose a fixed intention of long standing to convey or leave the greater part of his land to them. [Cohron v. Polk, 252 Mo. 261, 277, 158 S. W. 603, 607; Jones v. Thomas, 218 Mo. 508, 543, 117 S. W. 1177, 1188.] If not that, they at least evidenced the state of his feelings and affections. [Teckenbrock v. McLaughlin, 209 Mo. 533, 548, 108 S. W. 46, 50.]

He had nothing against his grandnephew, the appellant John Tobias Munday, but was not as close to him as he was to the Knoxes. The latter had served him and his brother and sister and lived with them for nearly forty years. He seems to have had a fear that Young Tobe would be extravagant. There is nothing specific in the record justifying that belief except the fact that he does not appear to have been a drudge and his outlook on life was different, but he was young and his character and course were not fixed. Such considerations may have meant much to a man living as Tobias Henson had lived.

We see little in the will and deeds, themselves, indicating undue influence on the part of Tom Knox. All on the same day, June 23, 1921, the old man gave young Tobe 700 acres of land by deed and will. In the deed to the 440 acres there were provisions restraining alienation until he should reach the age of thirty, but that could not serve any selfish purpose of Tom Knox. Two hundred acres were entailed by the will with the first alternate remainder to young Tobe's issue; and 120 acres he got as joint tenant with Tom Knox, the survivor to take all. Young Tobe was then nineteen years old. There was no reason, so far as the record shows, for expecting that he would not marry and have children. The remote contingency

that the 200 acres should go to Lizzie Knox in default of his issue would furnish little if any incentive for undue influence in that direction. The fact that the 120 acres was devised to John Tobias Munday and Tom Knox as joint tenants, the survivor to take all, rather tends to disprove undue influence, it seems to us. It is hardly to be supposed that Tom Knox would have sought that kind of a devise. Young Tobe was nineteen and he was about forty, and in the ordinary course it would be expected the land would eventually go to young Munday.

Practically all the evidence there is in the record on the subject discloses that the grantor did not have a friendly feeling for the appellant Reuben Munday. There is testimony from numerous witnesses indicating that, and while he is not quoted as having referred to the insanity inquisition instigated by Reuben, there is every probability that Tobias Henson was antagonized on that account. About the only evidence tending to show he had any affection for Reuben Munday is the fact that the deed which he executed conveying forty acres to Reuben reciting it was in consideration of love and affection.

There are two rather weak spots in the respondent's case. One is that the respondent Tom Knox did not testify. His silence on matters as to which he was competent warrants an unfavorable inference. Then again the testimony of Mr. Sims who drew the will and deeds on June 31, 1921, is confusing and leaves a doubt. The deeds were all recorded about eleven A. M. that day. He testified he spent about an hour going over them with Tobias Henson before they were executed. This would mean that Mr. Sims went to the office of Dr. Shelton that morning, had his interview with Tobias Henson, went back to his own office and prepared the four deeds (one of them with rather unusual and complicated provisions) and the will, all before ten o'clock. Added to this is his rather unsatisfactory explanation of the preparation and execution of the deed from Lizzie Knox the day before. Our surmise is that the whole matter was in contemplation the day before and it may be Tom Knox knew of it and carried the message to Mr. Sims that Tobias Henson was at the doctor's office. But granting this is so, after all, we must look to the facts and not to surmises. The evidence is too strong that Tobias Henson intended and wanted to do just what he did do.

In this connection it is to be observed that the position of the appellant John Tobias Munday in the case is not altogether consistent. The deed to him for the 440 acres was made in the same transaction as the will and the graveyard land deed to Tom Knox, which he assaulted. If the deed to Tom is tied up with the execution of the will, is his own free from taint? [Wigginton v. Burns (Mo.), 216 S. W. 756, 759.]

Taking the record as a whole and allowing due deference to the findings of the chancellor who saw and heard the witnesses, and who also tried the will case, we think the decree below should be and it is affirmed. *Lindsay* and *Seddon, CC.,* concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.