John Tobias Munday and Reuben P. Munday v. Thomas R. Knox, Elizabeth Knox and Thomas R. Knox, Executor of Estate of Tobias Henson, Appellants.—9 S. W. (2d) 960.

Division Two, October 6, 1928.

*Mann & Mann, Robert Stemmons* and *William B. Skinner* for appellants.

*R. M. Sheppard, Frank Williams* and *Neale & Newman* for re-spondents.

HIGBEE, C.—This action to contest the will of Tobias Henson, deceased, was begun in the Circuit Court of Lawrence County on December 4, 1923. On February 11, 1924, the venue was changed to Division Two of the Circuit Court of Greene County. There was a verdict for the contestants on June 1, 1925, signed by eleven of the jurors, and the defendants appealed from the judgment entered thereon.

An amended petition was filed which stated in substance that Tobias Henson died in Lawrence County on November 11, 1923, and thereafter, on November 14, an instrument purporting to be his last will and testament was admitted to probate in the probate court of said county, which purported will is set forth, and by which the testator made the following devises:

1. To my nephew, Reuben P. Munday, one dollar, which shall be his full share of my estate.

2. To John Tobias Munday and to the heirs of his body, I do give, devise and bequeath two hundred acres of land described as follows (here follows description); the said John Tobias to have a life estate therein, absolutely inalienable, with remainder in fee to the heirs of his body. If he, the said John Tobias Munday, shall die leaving no issue or legal heirs of his body, then and in that event, Elizabeth Knox shall have the remainder and to her and her heirs shall descend the fee after the death of said John Tobias Munday without bodily heirs surviving him.

3. To John Tobias Munday and to Thomas R. Knox, jointly, to each a half, as equal partners, I do give, devise and bequeath 120 acres of land described as follows (here follows description); the survivor to take the whole and the partnership or joint ownership shall not terminate till the death of one or the other of parties joined herein.

4. All the rest, residue and remainder of my property, real, personal and mixed I do hereby give and bequeath to Thomas R. Knox. . . .

The will nominates Thomas R. Knox, "whom I consider my best friend," to be the executor thereof and "that he be permitted to qualify as such without bond or surety."

It is averred that said paper writing is not the will of said Tobias Henson; that at the date of said instrument, June 23, 1923, said Tobias Henson had not mental capacity to make a will and the making and signing of said instrument was produced by the undue influence of the defendants Thomas R. Knox and his sister Elizabeth Knox; that at the time said Tobias Henson executed said will he was old, weak and of unsound mind and incapable of transacting any business or understanding the nature of an instrument conveying real estate or devising or bequeathing property by will, and was unable to read or sign his name and that defendants had full possession of all his property and the sole management of all his business affairs and occupied confidential relations to him and he was completely controlled by the will of the defendants and they exercised an undue influence over him, the said Tobias Henson; that plaintiffs are the nephews of Tobias Henson, deceased, and are his only heirs; wherefore they pray that an issue be submitted, etc.

The answer propounds the instrument as pleaded and contested, and prays to have the same declared to be the last will of the said testator and that an issue be submitted, etc.

In the statement of appellants' learned counsel it is said that in the early '70's, John and Tobias Henson, bachelor brothers, were living on a small farm about five miles north of Mt. Vernon in Lawrence County, and with them lived two maiden sisters, Nancy and Polly. Another sister, Margaret, had married a man named Munday, which sister had died leaving a son and grandson, Reuben P. Munday and John Tobias Munday, the plaintiffs in this action. Nancy died single, and the two bachelor brothers and the sister Polly continued to live on the farm until the death of each of them. Neither ever married.

Elizabeth Knox, aged eighteen, came into this family in 1885, and in 1887 her infant brother, Thomas R. Knox, aged about six, also came, and they remained with the family until the death of Tobias

Henson, November 11, 1923. For some years Lizzie received wages, but Tom was paid nothing.

According to the testimony of Judge Charles L. Henson (not related to the testator) the two brothers, on February 21, 1906, executed mutual wills, each devising all his property to the other, and enjoining on him the care and support of the sister Polly. Judge Henson testified also that in 1909 or 1910, in discussing a business proposition, Tobias Henson told witness it was their intention to give substantially all of their property to the defendants, Tom and Lizzie Knox. John Henson died on May 10, 1919, and his will was admitted to probate. It named Tobias Henson as executor and he qualified as such. Judge Henson also testified that after John's death, Tobias Henson came to his office and wanted some deeds and a will written to make over his property to Tommy and Lizzie Knox, except some he wanted to give to little Tobe Munday. He stated that Lizzie had been there and looked after them and waited on Polly in her lifetime; that Tommy was a good boy and had served them a long time and they deserved all he had; that he did not want to give Rube Munday anything as he would run through it. Judge Henson declined to prepare the papers and Tobias Henson remarked he would 'phone Congressman Manlove, then living in Pierce City.

Mr. Manlove testified that on December 6, 1919, Henson asked him to make a deed to Tom Knox and one to Lizzie Knox and indicated the lands; that he prepared a deed conveying 320 acres to Lizzie Knox and another conveying 505 acres to Tom Knox. These were executed, each reserving a life estate in the grantor, and were offered in evidence at the trial by plaintiffs. After the deeds were executed, Henson asked witness to draw his will, devising eighty acres of timber to young Tobe Munday and dividing the balance of his property between Lizzie and Tom Knox. Mr. Manlove declined to draw the will, saying that he thought Henson ought to take care of his blood kin; that "if he wanted to do that he better get somebody else."

Following the execution and record of these two deeds, Reuben P. Munday, on October 9, 1920, instituted a proceeding in the probate court to inquire into the sanity of Tobias Henson. At the hearing of this complaint Tobias Henson appeared and testified that he had sent for Mr. Manlove to make the deeds the previous December; that neither Tom nor Lizzie Knox knew of his intention to make the deeds until he got ready to make them; that he and his brother John had talked it over and had agreed that Tommy Knox should have the farm known as the Stahl farm because he had been a good boy and ought to have it, and that John had told him less than a month before he died that he wanted him (Tobias) to see that Lizzie got the home

place, a half section, 320 acres. Pending the inquiry this complaint was withdrawn by Reuben P. Munday at his costs.

The will was drawn on June 23, 1921, by Mr. Arch L. Sims, and executed by Mr. Henson at Mt. Vernon, and witnessed by Mr. Sims, T. H. Mayberry and H. S. Fowler. On the same day, Henson appeared before the pension board at Mt. Vernon, composed of Drs. Knapp, Townsend and Shelton, on an application for an increase of his pension from $50 to $72 per month, which was granted.

At the time of the execution of the will, Henson also executed a deed conveying 440 acres to John Tobias Munday, a deed conveying forty acres to Reuben P. Munday, a deed conveying 160 acres to Thomas R. Knox, and a deed to Elizabeth Knox exchanging 160 acres for 160 acres which Henson had previously deeded to her, "which she had deeded back to Mr. Henson on June 22, 1921, and which was included in the land conveyed on this date to John Tobias Munday." These were all filed for record.

Mr. Sims testified: I wrote the will (identifying it). Henson sent for me on June 23, 1921. I found him in Dr. Shelton's office in Mt. Vernon. He told me he wanted me to do some writing, some deeds and a will; a deed for forty acres to Rube Munday and a deed for 200 acres to John Tobias, or will it to him, I forget which it was. . . . He told me Tobe Munday was a farm boy and ought to have a farm; wanted it fixed so he would keep it long enough to be valuable. He said: "This is all he is fit for, is farming. Tie it up so he will have a farm tied up so he can't run through with it; might run through with it if it wasn't tied up." Was very particular about wanting to give Tobe Munday a farm, said it was all he was fit for; if he got a farm so he could run through with it he would do so right away.

There was testimony that Henson and his brother had little property when defendants came into their family; that they borrowed money and invested in lands which constituted their estate, and that the defendants had helped them to acquire it. There was also evidence that Tobias Henson was a strong personality and retained his mental vigor until the day of his death.

It is stated in appellants' reply brief that Lizzie Knox became a favorite of all three members of this family; *"trusted, loved,* depended upon and confided in by them;" that Polly was a helpless invalid for ten years, during which time Lizzie tended her like a babe. "Next John was stricken and he too for years was a helpless invalid and he wanted no one to wait on him but Lizzie Knox and that she did, faithfully, carrying the other burdens of the house hold along with it. *She did the same thing for Tobias.* It is also stated that the record shows that Thomas R. Knox was *"closer to*

*Tobias Henson than any other living person* . . . and that now John was dead and the burden cast upon the *feeble shoulders of Tobias, crippled in his feet and palsied in his hands,* but otherwise fully possessed of his mental faculties.'' (Our italics.)

Polly Henson died in 1916. The evidence tends to show, and it seems to be conceded, that John Henson, during the last two or three years of his life, was a helpless invalid, and died in May, 1919, at the age of eighty-three; that from the time John became helpless, Thomas R. Knox, as the trusted and confidential agent of the two brothers, had charge of their farms and all their business, making bank deposits in their names and drawing checks upon their bank account, which was in the name of J. and T. Henson. On John's death and the probate of his will, the money in the bank in the name of J. and T. Henson, $4705.47, was transferred to the account of Tobias Henson, executor. Whenever Tobias Henson went to the probate court he was accompanied by Knox and all questions relative to the estate were referred to Knox. Knox drew checks upon the bank account, signing the name of Tobias Henson, executor, by Thomas R. Knox.

On October 8, 1919, four months after John Henson's death, Tobias Henson and Knox entered into a written contract of partnership, reciting it was for the purpose and business of farming and stock raising upon the land of said Tobias Henson and the land of said Knox in Lawrence County, Missouri; the lands of neither being considered as included in the said partnership, only the use thereof being included . . . each member of the firm being responsible for half of the debts and each to have half the profits thereof. ''The said Tom Knox shall be the manager thereof and look after all the details thereof and shall keep the books thereof and employ the labor or perform the same himself as he may think best. That no labor nor personal care nor attention shall be required of said Tobias Henson except such as he may volunteer. This agreement shall remain in force during the life of the parties with the understanding that the same is an entirety—the partnership terminating at the death of either party and the surviving partner taking and owning thereafter the entire assets of the firm immediately on and after the death of either member of the firm.''

After the execution of this contract, Knox was in active charge of Henson's affairs and so remained until Henson's death. Two months after the execution of this so-called partnership contract, which Henson called ''going havers,'' that is, on December 6, 1919, Knox took an attorney and two witnesses to the Henson farm five miles north of Mt. Vernon, and the deed conveying 505 acres to Knox and the deed conveying 320 acres to Lizzie Knox were drawn and attested. Knox then went to Mt. Vernon and took the circuit clerk to the

farm, who took and certified Henson's acknowledgment to the two conveyances. This would indicate that Henson was too feeble to make the trip to Mt. Vernon. It also appears that on December 5, 1919, two months after the execution of the partnership contract, the money to the credit of Tobias Henson, executor, in the bank at Mt. Vernon, $3112.97, was transferred to the credit of Henson and Knox by check of Tobias Henson, Exr., signed by Knox. Thereafter Henson had no bank account. All money received from any source, including Henson's pension money, was deposited to the credit of Henson and Knox.

J. E. Brown testified: I worked at the Henson farm, moved my family there in March, 1919. Q. What, if anything, did you hear Tom Knox say to Tobe Henson or John Henson about Tobe Munday? A. I have heard him talk about Tobe not working or something like that. He just spoke about he wouldn't save his money, something like that; he wouldn't work like he believed he should or something like that. Witness further stated that after John Henson's death he heard Lizzie say to Tobias Henson: "If you don't do as we say we will leave." Uncle Tobe had his handkerchief in his hand and sat this way (Indicating). Q. You mean with his handkerchief up to his face? A. Like this (Indicating).

John Henson, a second cousin of the testator, testified that in October, 1920, he went to Henson's to pay the rent on the Stahl creek farm; that he had a conversation with Henson and Knox about the rent and that Henson said to him, referring to Thomas and Elizabeth Knox, "I have to sweeten them to keep them with me." Q. What other conversation did you have with him? A. Tobe told me he wanted to go and have his business fixed up. He says, I want Tom and Lizzie to stay on the home place as long as they live or as long as they want to and then, he says, I want it to go to the kinfolks. Q. To whose kinfolks? A. To Tobe's kinfolks. He said they don't want it to go that way. They want it to go to their folks. He says I don't think that is right. He had tears in his eyes when he was talking.

Mrs. Mattie Munday: I am the mother of little Tobe and the widow of Sherman Munday who died January 7, 1919. He was the son of Margaret Munday, a sister of Tobe and John Henson. John Henson died four months after my husband's death. The relations between our family and the Hensons were always cordial up to the death of Tobe Henson. After my husband's death I advised with John Henson concerning the settling of my husband's affairs. John Henson was the business man of the two brothers. Uncle Tobe died November 11, 1923, four years after Uncle John died. Tom Knox took charge and control of the Henson farm after John's death. The Hensons gave Knox a farm of 300 acres before John's death. Uncle John

said it was good land. We visited at Uncle Tobe's once or twice a week. He did not tell me about making the partnership contract or deed to Tom Knox in December, 1919. I saw the transfers in the paper. I first learned of Henson's deed of June 23, 1921, to my son by seeing it in the paper. At that time my son was about nineteen years old; he was born in 1902. The deed was never delivered to me for my son. I had a conversation with Tom Knox about two weeks after John Henson's death. Tobe was about sixteen at that time. Tom said he wanted Tobe to straighten up and be more of a man, not so much of a kid; they expected him to have most of what they have got over there. He was referring to Uncle John and Tobe. Two or three weeks later I had another conversation with Knox. He said he had been talking to Uncle Tobe about fixing up his business, and he said he asked him if he would make him equal heir with little Tobe, and he said Uncle Tobe said he would. Tom said he wanted this done by deeds because the will might be broken. After John Henson's death I told Tom Knox I didn't think they ought to give Tobe so much timber land; wouldn't make him anything with the high taxes. He said: ''Well, he had some good cultivating land willed to him.'' He named the willed land several times. He told me if I would come over there he would read the will to us and show us the deeds and if we were satisfied he wanted us to sign a paper to that effect. I went over the next day, but he left as soon as I got there.

Mrs. Munday further testified that when she was at Uncle Tobe's he told her they had cut walnut logs to pay little Tobe's hospital bill; that, later on, Tom Knox told her that Uncle Tobe ''like to died worrying about that doctor bill [for little Tobe's broken leg] not being paid,'' and he (Knox) said: ''I told him how he could pay it by selling logs off that land willed to Tobe.'' He further said: ''I could have persuaded Uncle Tobe to have sold the logs and I could have had the money.'' This latter conversation was in January, 1924, after Tobias Henson's death.

Mrs. Munday testified further: I had a conversation with Tom Knox on the Sunday following the inquiry into Uncle Tobe's mental condition. He said the case would come up again the following week and Tobe and I ought to stand by Uncle Tobe in that; there were 900 acres left and that was all for Tobe.

It appears from the evidence of Dr. Townsend, appellants' witness and a member of the Federal Pension Examining Board, that Tobias Henson appeared before the board at Mt. Vernon on an order from the department at Washington on his application for an increase of pension. ''At that time he was so frail, instead of coming to the regular office in Dr. Knapp's office, he went to Dr. Shelton's office

which was on the ground floor. He was so frail the attendants helped him into the office and with a very cursory examination we allowed his claim, considered him entitled to the increase. . . . The old man was frail. That frailty naturally affects the mind to a certain extent. He was not a man that you would call lost his mind. He talked very reasonably and very intelligently for a man of his age. I considered his mind fairly good for one of his age and condition. Q. Suppose he was associated every day with people in whom he had confidence, who had charge of his business. wrote his checks, wasn't he in that state more easily influenced than a younger man? A. I would say yes. He had partial paralysis or something to that effect. It is an affection of the nervous system. His mind might have been affected. The purpose of our examination was to develop the fact that Mr. Henson at all times needed the assistance of some third person to get along in the world. We were unanimous that the old fellow was helpless in that sense of the word.''

I. Appellants assign error in the refusal of their instruction in the nature of a demurrer at the close of the evidence. It may be conceded that the proponents offered substantial evidence that the testator possessed testamentary capacity at the time of the execution of the will. However, as was said in Fowler v. Fowler, 318 Mo. 1078, 1085, 2 S. W. (2d) 709:

''In determining the sufficiency of respondents' evidence, we must put the appellants' evidence out of consideration, save as it may aid respondents' case, and must accept respondents' evidence as entirely true and give respondents the benefit of every inference legitimately to be drawn therefrom. This rule is so well established that citation of cases is unnecessary.''

Knox was copartner and manager of Henson's business. As such he sustained a confidential relation to Henson. Such a relation arises whenever a continuous trust is reposed by one person in the skill and integrity of another. '' 'All the variety of relations in which dominion may be exercised by one person over another' falls within the general term 'confidential relation.' '' [12 C. J. 421; Cornet v. Cornet, 248 Mo. 184-6, 154 S. W. 121, and cases cited.]

The evidence not only sustains the contention that a confidential, fiduciary relation existed between Tobias Henson and Thomas Knox at and a long time prior to the execution of the will, but that relation, aside from the copartnership, seems to be conceded in appellants' brief as noted in the statement of the case. It concedes that Polly, John and Tobias Henson were each in turn helpless invalids, and that Thomas R. Knox was closer to Tobias Henson than any other living person, ''and that now John was dead and the burden

cast upon the feeble shoulders of Tobias, crippled in his feet and palsied in his hands, but otherwise possessed of his mental faculties." It is unnecessary to repeat the evidence; the record shows that the testator unreservedly confided the management of his business to Knox as his copartner. All matters were referred to Knox who transacted all the business, deposited Henson's money in the bank and checked it out. He checked Henson's money out of the bank and deposited it to the credit of the so-called partnership of Henson and Knox. Henson was seventy-eight at the time this contract was executed. He spoke of the contract as "going havers," but on its face it purported to transfer all of Henson's personal property at his death to Knox. Under this contract Knox remained in charge of Henson's property to his death on November 11, 1923, at which time Knox claimed it by right of survivorship. The evidence clearly authorized the finding that there was a confidential relation between Knox and the testator at the time of the execution of the will and the burden was upon the beneficiaries to prove that the will was not the result of undue influence. [Sittig v. Kersting, 284 Mo. 143, 167, 223 S. W. 742, and cases cited; Ehrlich v. Mittelberg, 299 Mo. 284, 303, IV, 252 S. W. 671.]

There was, however, evidence that Knox poisoned Henson's mind against his grand nephew and procured the will by actual undue influence. Knox told Mrs. Munday and her son that the lad, then sixteen, should straighten up, that the Hensons expected Tobe would have most of what they had. He further told her he had been talking to Uncle Tobe about fixing up his business and Henson had agreed to make Knox an equal heir with Tobe and that he, Knox, wanted this done by deeds as a will might be broken. J. E. Brown heard Knox tell Henson that little Tobe would neither work nor save. Following this, Henson conveyed 505 acres to Knox and 320 acres to Lizzie Knox, all good land, and when executing the will directed that the devise of 200 acres to his grand nephew be tied-up so it could not be run through with. The evidence shows that at the time of the trial, John Tobias Munday was and for two years had been a student at the State Teachers' College at Springfield and there is no evidence in the record that he was an idler or in any way unworthy of the confidence and esteem of the testator which, it appears, he had formerly enjoyed. John Henson, a second cousin, testified that in October, 1920, Tobias Henson told him he wanted his property to go to his kinfolks but that they (Tom and Lizzie Knox) didn't want it to go that way; they wanted it to go to their folks. He had tears in his eyes when he was talking.

The demurrer to the evidence was properly overruled.

182

II. Appellants complain of error in the instruction given for the plaintiffs as follows:

"2. The court instructs the jury that if you find and believe from the evidence that, pursuant to the written contract offered in evidence, Tobias Henson and Thomas R. Knox entered upon the partnership business therein referred to, and that Thomas R. Knox became and continued the active partner, and that he had charge and control of the partnership affairs and continued therein until the death of Tobias Henson, then, under said written contract a confidential and fiduciary relationship existed between them from the beginning of said partnership until such death.

"3. The court instructs the jury that if you find and believe from the evidence that, for many years prior to the death of John Henson, the defendant Thomas R. Knox and the deceased Tobias Henson lived together as one family and, after the death of John Henson, said Thomas R. Knox and Tobias Henson continued to live together as one family to the date of the death of said Tobias Henson; and, if you further find and believe from the evidence that shortly after the death of said John Henson the said Thomas R. Knox and Tobias Henson became partners, and that the said Thomas R. Knox took sole control and management of said Tobias Henson's business, property and affairs and continued so to do up to the death of said Tobias Henson, and that the said Tobias Henson looked to him for advice, counsel and direction during said period of time, then, under the law, said Thomas R. Knox sustained a fiduciary and confidential relationship with the said Tobias Henson; and, if you further find that the said Thomas R. Knox is the substantial beneficiary in the said purported will, then the law presumes that said purported will is the product of undue influence of the said Thomas R. Knox over the said Tobias Henson, and it devolves upon the lefendants to overcome such presumption of undue influence by the preponderance of the evidence, and unless the defendants, by a preponderance or greater weight of the evidence have sustained the burden of proof in this respect, then you should find that said paper writing, read in evidence, is not the last will and testament of said Tobias Henson, deceased.

"4. The court further instructs the jury that direct evidence is not required to establish undue influence, and that you may find same from the facts and circumstances in the case, including the will itself and its provisions and the relations and transactions between the said Tobias Henson and Tom Knox, if, in your opinion, all the facts and circumstances taken together justify such finding.

"5. The court instructs the jury that in determining the question whether undue influence was used to procure the execution of

the paper writing offered as the last will of Tobias Henson, they will take into consideration said Tobias Henson's age, mental capacity and physical condition at the time of executing said will, the will itself and the provisions therein, together with the relations that existed at the time between the said Tobias Henson and Tom Knox, together with all the other facts and circumstances shown by the evidence.

"6. The court instructs the jury that the certificate of the witnesses attached to the paper writing purporting to be the last will and testament of Tobias Henson, and the certificate of the probate court admitting the same to probate, are not any evidence that said paper writing was the last will and testament of Tobias Henson, but are admitted for the sole purpose of showing that the provisions of the law requiring that said paper writing should first be presented to the probate court in the county in which the testator lived at the time of his death, had been complied with.

"7. The court instructs the jury that any statements the said Tobias Henson may have made about his domestic affairs will not be considered by you for the purpose of determining their truth, but only for the purpose of determining his mental condition and his mental attitude towards the persons referred to in such statements, if any; and the court instructs the jury that, in determining whether undue influence was used to procure the execution of the paper writing offered as the will of Tobias Henson, they will take into consideration his mental and physical condition at the time of the execution thereof and any statements he may have made, the will itself, and the provisions therein, and the other facts and circumstances in evidence.

"X. The term 'undue influence,' as used in these instructions, does not mean that influence which arises from affection or a desire to gratify the wishes of one beloved; but means an influence exercised upon the mind of the testator at the time he makes his will in such a way as to amount to over-persuasion, coercion or force sufficient to destroy the will power of the testator and deprive him of his free agency to dispose of his property according to his own inclinations."

It is contended by appellants that, conceding that a fiduciary relation existed, it did not raise a presumption of undue influence in the absence of evidence showing that the will in question was drawn by the beneficiary charged with exercising undue influence or that it was suggested or influenced by him in the making and execution thereof. "The presumption of undue influence, which is said to arise when it appears that a beneficiary in the will sustained fiduciary relations to the testator, is at most but one of fact and not of law, and it drops out of the case when evidence to the contrary appears, and in such circumstances it is error to submit such a presumption to the jury."

The court gave appellants' Instruction B, reading:

"The court instructs the jury that a will in favor of persons standing in close confidential relations to the testator is presumed in law to have been made under the influence exercised by such beneficiary, but that said presumption is not conclusive, but simply shifts the burden to the defendants of proving that they did not exercise undue influence over said Tobias Henson in the making of the will. And you are further instructed that if you shall be satisfied from all the evidence that neither of the defendants exercised an undue influence over the testator, Tobias Henson, as undue influence is defined in these instructions, to induce him to dispose of his property as provided in the will, then the jury shall find said will is the will of said Tobias Henson."

This instruction is substantially the same as plaintiffs' Instructions 2 and 3. If there was error in giving them, it was invited and appellants cannot complain. [4 C. J. 709; Ard v. Larkin (Mo. App.), 278 S. W. 1063, 1069, and cases cited.]

But plaintiffs' instructions properly declared the rule: "If in such circumstances [confidential relations] a gift of any considerable value be bestowed by the one who reposes confidence upon the one in whom confidence is reposed, such gift is presumptively void. The burden is cast upon the recipient of the gift and it belongs to him to show the absolute fairness and validity of the gift and that it is entirely free from the taint of undue influence. This sound and wholesome doctrine applies as well to suits at law as to proceedings in equity, and is as broad in its scope as the existence of confidential or fiduciary relations. The rule 'stands upon a general principle applying to all the variety of relations in which dominion may be exercised by one person over another.'" [Hall v. Knappenger, 97 Mo. 509, 511, 8 S. W. 739; Garvin's Admr. v. Williams, 44 Mo. 465, 478; Cornet v. Cornet, 248 Mo. 184 (7), 234, 235, 154 S. W. 121; Ehrlich v. Mittelberg, 299 Mo. 284, 303, 252 S. W. 671, and cases cited.]

The recitations of the will itself may be considered as tending to establish a confidential relation. [Hall v. Knappenger, supra.]

III.   There is no merit in the contention that instructions numbered 4, 5 and 7 are erroneous in that they are comments on the evidence and tend to give undue prominence to circumstances referred to in the instructions. [Ehrlich v. Mittelberg, supra, l. c. 301, III.]

IV.   It is further contended that Instruction 7 is erroneous in that under the facts in this case statements and declarations shown

to have been made by the testator were substantial evidence of the truth of the things related by him in such statements and they should have been received and considered by the jury as proof of the facts he stated far beyond the limits of such instruction.

A number of the testator's statements and declarations were put in evidence. Appellants have failed to indicate which one of these declarations should have been considered as substantial evidence of the truth of the things related by him in such statements, and in this respect the assignment is too indefinite to receive consideration. The instruction, however, told the jury that statements the testator "may have made about his domestic affairs will not be considered by you for the purpose of determining their truth, but only for the purpose of determining his mental capacity and his mental attitude toward the persons referred to in such statements, if any."

In Jones v. Thomas, 218 Mo. 508, 543, 117 S. W. 1177, it was contended the court erred in excluding evidence of declarations of the grantor tending to show improper acts and conduct on the part of his son Thomas and members of his family. It was held that such "testimony was admissible only for the purpose of showing the mental condition of the grantor and the state of his affections. All such declarations have no probative force to establish undue influence." This is the general rule. [40 Cyc. 1157.]

The court gave nine instructions and refused seven other instructions asked by appellants. The court might very properly have refused all of the instructions prayed by the appellants because of their multiplicity; they were well calculated to confuse the jury. The instructions given for the appellants and respondents fully covered the issues in the case. Some of the refused instructions were repetitions of instructions given and others were refused because they improperly declared the law.

The case was well tried, the verdict is supported by substantial evidence and the judgment is accordingly affirmed. *Davis* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.