**MACHENS et al. v. MACHENS.**

No. 43278.

Supreme Court of Missouri, Division No. 1.

Dec. 14, 1953.

Motion for Rehearing or to Transfer to Court en Banc Denied Jan. 11, 1954.

B. H. Dyer, Wm. Waye, Jr., St. Charles, for appellant.

Robert V. Niedner, Paul F. Niedner, Niedner & Niedner, St. Charles, for respondents.

HYDE, Presiding Judge.

This is a will contest, involving title to real estate. The verdict was for plaintiffs, the contestants, against the validity of the will, and defendant, the proponent, has appealed. The case was submitted on the issues of mental capacity and undue influence; and the principal questions on this appeal are whether or not there was substantial evidence to support a verdict on these grounds.

The testator, Henry Machens, died March 26, 1951, at the age of 87. The will was made on March 19, 1949. Testator's wife died in 1921; and from 1927 until his death he made his home with his son Christopher, usually called Chris, occasionally visiting his other children, especially his daughters, for periods of from a few days to a month. Plaintiffs are three sons and three daughters of testator and a granddaughter, the child of testator's deceased daughter; defendant is also his son. The will contained four articles. Article One gave $25 for masses to the pastor of the St. Francis Catholic Church at Portage des Sioux. Article Two gave all real estate to defendant, and provided that he should pay all debts, funeral expenses, the gift mentioned in Article One, the cost of administration and settlement of the estate and $500 to each of the other six children and to the child of the deceased daughter. Article Three gave all the rest of testator's property to his seven children and one grandchild share and share alike. Article Four appointed defendant executor without bond. The inventory of testator's estate showed $49,800 in real estate and less than $600 in personal property. The substantial property of the estate was two farms which had been operated by defendant for more than 20 years.

Testator had made a will in 1935 in which he divided all his property, real and personal, equally among the seven children (plaintiffs and defendant herein), after certain legacies. This will appointed the testator's brother Andrew executor but, in case he could not serve, appointed his daughter, Gertrude Musgrove. Chris said that testator talked to him several times about this will. In 1948, testator took it out of the desk drawer and put it in a can in a shed, which was practically a fire proof building (a steel machine shed with a concrete floor) because he said he did not want it destroyed if the house should burn. Chris said testator told him that was the way he wanted his estate divided and told him to have it probated when he died. Chris did not learn of the later will until he took this one in for probate after his father's death. Prior to 1948, testator was fairly active and did chores around the farm such as feeding the hogs and the chickens. He seemed to be getting old in 1946 and 1947 and his "memory was failing him some—not a whole lot, but he would know what you were talking about." He was "getting feeble" and didn't take the interest in things like he had prior to that time. On September 15, 1948, testator fell from a corn crib and sustained a fracture in his hip joint. He was taken to a hospital in Alton, Illinois, and was found to also have uremia and an enlarged prostate gland. After his fracture was reduced by use of a nail to hold the bones in place, his prostate gland was removed. Testator was kept in the hospital until October 9th. He was kept in a wheel chair the rest of the year but, by February 1949, he could get around to some extent with crutches; and he used crutches continuously after that time.

Plaintiffs had testimony, concerning testator's mental condition, of two doctors, who treated him after his injury. Dr. William McGinnis, who was his doctor at the hospital, first became acquainted with him in 1938, when he frequently went to the home of Chris to take care of his family. He said testator was a man of intelligence and will power and that he used to have many discussions with him on politics and other things. He said he had very high blood pressure the first time he examined him in March 1941. Dr. McGinnis said, when testator came to the hospital September 15, 1948, he was suffering from shock and circulatory failure so that they did not nail his hip until the 17th. He had developed an obstruction of the urinary system which was later relieved by the prostate operation. X-rays taken in the hospital "showed severe calcification of the arteries", called arteriosclerosis, "in lay language hardening of the arteries" which the Doctor said would cause "inability of the brain to normally function." Dr. McGinnis also saw testator in January and March, 1949. He said, in January, testator's mental condition had been affected by the operation, drugs and other things in connection with it. He said, on March 24th, "the-

heart was bad, not functioning normally, his ankles were swollen, his legs were swollen" from "an abnormal collection of fluid in the tissue", due to arteriosclerosis and general circulatory trouble. He said testator was in a state of mental confusion and "would not answer questions coherently"; and this was not his mental reaction of "a couple of years previously." The Doctor gave his opinion that testator was suffering from senile dementia on March 24th; and that it would not have been any better on March 19th, the day the will was executed. Dr. McGinnis said his opinion was that testator was not of sound mind on that date.

Dr. Joseph Conrad saw testator at the home of his daughter, Mrs. Gertrude Musgrove, in Chillicothe, Missouri, about the first of November 1948. He said, in his opinion, testator "was a senile dementia case." He said: "He was talking of the past. He wasn't talking or thinking of the present. * * * He wasn't rational. * * He didn't talk good sense." He called it "arteriosclerosis of the brain"; and said: "The blood vessels become occluded and that part of the brain, where that occlusion is, the brain doesn't function and the blood supply doesn't repair itself. * * *. part of the brain has been destroyed by this occlusion of the blood vessels." Dr. Conrad also said: "Any layman could have diagnosed it. They would have known he wasn't right."

Six of the plaintiffs, the sons and daughters of testator, testified as did several of the neighbors of Chris, and a brother of testator, and expressed their opinion based upon personal observation that testator was not of sound mind at the time the will was made. Defendant and several other witnesses gave contrary testimony. There were 52 witnesses and the record contains 2,454 pages, much of which is testimony concerning the conduct and condition of testator. Plaintiff's evidence was that testator had been a man of strong will and intelligence, a very successful farmer, and careful and competent in his business dealings. He was very much interested in politics and current events, reading the daily newspaper, books and magazines, and discussing them with his family and acquaintances; he was also a lover of music, and knew · historical dates and geographical facts. After his injury and operation he lost these interests and would talk only of the past in a rambling, disconnected, repetitious way. His conversations "wouldn't make any sense" and were all jumbled. (Many specific examples of this were given.) His memory failed and he would not recognize friends or members of his family, children and grandchildren. After being told who they were and talking to them he would ask again who they were. He would ask the same questions about many matters over and over again. He would sign any papers (checks, rent receipts, etc.) that he was asked to sign and did not seem to understand or be interested in what they were. He would hold the newspaper upside down and look at it for a long time without seeming to know it. He "looked like he was always in a daze." He would not know where he was and, when he was at one of his daughters' homes, would think that he was at the home of Chris. He would not realize the seasons of the year, asking if it frosted or snowed in the summer and asking in the winter about fruit and crops. Sometimes when asked what he had been doing, he would say: "working out in the field." He also mentioned several times about seeing a man, who had not lived in the community for many years, when there was no one at the place where he was looking. He would be dizzy and have fainting spells. He asked many times about friends and relatives who had been dead for some time and would not remember he had been told they had died. He would ask about clearing land that had been cleared years ago. He would urinate in the yard in the presence of his grandchildren and other people, although he had previously been "a very modest man." He could not distinguish between green and ripe fruit. He put sugar on potatoes and would eat at the table with his fingers until reminded to use a fork or spoon. Many incidents of a similar character were related, showing he was like a child, with a childish mind, and would do whatever he was told to do.

728

Defendant contends there was no substantial evidence to show that testator was of unsound mind on March 19, 1949, the date of the will herein involved. Defendant cites and relies on Rothwell v. Love, Mo.Sup., 241 S.W.2d 893; Vaughn v. Vaughn, Mo.Sup., 221 S.W.2d 170; Ahmann v. Elmore, 211 S.W.2d 480; Smith v. Fitzjohn, 354 Mo. 137, 188 S.W.2d 832; Walter v. Alt, 348 Mo. 53, 152 S.W.2d 135; Rex v. Masonic Home of Missouri, 341 Mo. 589, 108 S.W.2d 72; Canty v. Halpin, 294 Mo. 96, 242 S.W. 94. However, the evidence in these cases is not comparable to the evidence in this case. The medical evidence in this case was based on actual observation (and long acquaintance of one doctor) and not merely on hypothetical questions. It is argued that plaintiffs were partisans, that their testimony was fantastic and hard to believe, and that there was much evidence produced by defendant to the contrary on the issue of mental incapacity. These matters of credibility and conflict of testimony were for the jury. It is also stated that, even if believed, this testimony does not show mental incapacity. Our conclusion from carefully reading the entire record is that the testimony of the two doctors (one of whom had known and treated testator over a period of more than ten years), together with the testimony of testator's children and neighbors as to his inability to recognize or remember members of his family and long time acquaintances, to know where he was or what season of the year it was, to talk to them coherently, or to understand matters or transactions attempted to be explained to him, and the specific incidents related by these witnesses both before and after March 19, 1949, constituted substantial evidence to make a case for the jury on the issue of mental incapacity on the date the will was executed. See Andrew v. Linebaugh, 260 Mo. 623, 169 S.W. 135; Rock v. Keller, 312 Mo. 458, 278 S.W. 759; Pickett v. Cooper, 354 Mo. 910, 192 S.W.2d 412; Ambruster v. Sutton, 362 Mo. 740, 244 S.W.2d 65. We, therefore, hold that the Court properly submitted this issue to the jury.

On the issue of undue influence, the evidence, most favorable to plaintiffs, shows there had never been any disharmony in the family and no quarrel or disagreement between testator and any member of his family. (Even defendant so testified.) Testator said many times: "You children will all get my property some day"; and made a will on that basis, with which he expressed entire satisfaction as late as August 1948. He visited his children frequently, especially his daughters and was affectionate to them. Chris, Gertrude and defendant were the last of the children to marry (all married in 1926); and they lived with testator from 1921 (when their mother died) until 1926, on the home place at Machens (defendant continued to live there and farm it after his marriage) with Gertrude keeping house for them. No reason for any change in the plan of testator's previous will appears. After March 1949, testator continued to live with his son Chris as he had for more than 20 years before his injury and he frequently visited his daughter Bernadine Teipel, who lived at Machens about seven or eight miles from the home of Chris, as he had always done. His daughters gave much of their time to his care, after he left the hospital in October 1948, especially during the five months prior to the time the will was made, March 19, 1949. The making of the will was concealed from all of the other children, until after testator's death. Testator never stayed in defendant's home after March 1949, according to plaintiffs' evidence, although he would go over there occasionally while visiting Bernadine, as defendant's house was only about 100 yards from Bernadine's husband's store in the town of Machens. After the will was made, defendant made extensive improvements on the farm where he was living (over $4,000 on the house) which would go to him under the will.

It was also shown that defendant came to the hospital, with the lawyer who later prepared the will herein involved, on the day before testator's prostate operation. Testator's daughter, Gertrude Musgrove, was pushing him around the halls in a wheel chair. She accused defendant of being there "for suspicious reasons" and said to the lawyer: "I want you to know

that Papa has more children than Andrew. * * * Andrew is looking out for himself." The lawyer then asked how many children there were and she told him. She then left the three of them together but said her father "didn't even know one person from the other." Defendant did not say anything to her and was "in a sort of a quiver like." The lawyer said defendant told him his father wanted to see him, so he went to the hospital with defendant. He said as to the purpose: "Now, when a person is in the hospital and they send for a lawyer, you frequently think maybe they want their will written, and sometimes I write them under those circumstances." However, he said, concerning his conversation with testator at the hospital: "He didn't tell me that he had any business that he wished me to look after or tend to or do anything about. So after spending about fifteen minutes there I left." Defendant paid him for the trip. (Defendant said he got the money from his father.) The lawyer was representing defendant, at that time, in a suit over the title to his own land and he regularly made out defendant's income tax returns. He was also employed by defendant to represent him as executor after the will was probated. Defendant stated in a deposition that testator said he wanted defendant to have his two farms, as defendant and his lawyer were leaving the hospital. However, at the trial, he testified that nothing was said about that then but that testator had often so stated previously and stated the same desire again afterwards. Defendant also said that the first day he visited testator at the hospital, he said: "I want to get rid of those two farms." While testator was in the hospital, Chris had a power of attorney prepared, appointing defendant, himself and Gertrude Musgrove to manage testator's financial affairs. Defendant refused to have anything to do with it, denounced it as "craziness", and nothing was ever done under it.

When the will was made, defendant brought testator in his automobile to the office of the lawyer, who had previously accompanied him to the hospital, and later paid him for making the will. Defendant's evidence was that testator was brought in one day to discuss the terms of the will with the lawyer, and on the next day to approve and sign it, and that defendant was not present on either occasion, during these discussions, but, after helping testator into the lawyer's office, left them to discuss it alone. He came back and drove them to the bank, where the will was signed, witnessed and left for safekeeping, but stayed outside. Defendant had operated the two farms for testator ever since 1927 when he went to live with Chris. Defendant said he paid as cash rent whatever testator wanted. He said for 1947 he paid about $1,600. For 1948, he said he paid about $3,000. He said he paid testator $500 and used the rest for improvements on the house where he was living. He said testator told him "to spend it on that house and fix it up." Defendant also attended to filing testator's income tax returns, having them prepared by the lawyer who made the will; and paid the taxes on testator's land for him. Testator's income tax return for the year 1948, showed $3,300 rent from the farm and $270 rent from a house. The tax of $59.17 was paid by defendant's check in January 1949. Defendant also negotiated a deal for $500 for a pipe line easement across one farm, which was completed while testator was in the hospital. For 1949, defendant used all of the rent on improvements and paid testator nothing; but defendant did not have an income tax return made for testator for that year. Defendant said his father told him: "you keep fixing the house up", and defendant stated "that is just what I done." After testator's death, and before the will was opened, defendant paid his hospital and doctor's bills for his last illness (a heart condition) and his funeral expenses, as Article Two of the will provided for him to do.

■■■ On the issue of undue influence, defendant relies mainly on State ex rel. Smith v. Hughes, 356 Mo. 1, 200 S.W.2d 360; Buckner v. Tuggle, 356 Mo. 718, 203 S.W.2d 449; and Baker v. Spears, 357 Mo. 601, 210 S.W.2d 13. Defendant argues

that there is nothing more than suspicion and conjecture as to undue influence and says that there was no fiduciary relationship between him and testator. We cannot agree. We think that defendant's operation of testator's farms without any definite agreement as to rent, paying his taxes, preparing his income tax returns and paying the tax, negotiating the pipe line easement and having a free hand to use testator's money for extensive improvements on the farm where he lived, are sufficient circumstances to show a confidential fiduciary relationship between them. This is particularly true for the period just prior to and during the time the will was made (December 1948 and January, February and March 1949) when testator was staying most of the time in defendant's home. Furthermore, unusual activity by defendant was shown in the making of the will. He brought his lawyer, who finally wrote it, to the hospital the day before testator's serious operation; and it is at least a reasonable inference from what was said and done that the presence of Mrs. Musgrove prevented the making of a will at that time. Defendant took testator from his home to his lawyer's office when the will was prepared and executed. He paid his lawyer for the trip to the hospital and for the making of the will. Whether he was actually present in the room at the preparation and execution of the will is not decisive. An inference of undue influence is warranted where there is confidential fiduciary relationship and unusual activity in the preparation and execution of a will or deed by one who profited greatly from the instrument over the maker's other children, for whom he held equal regard and had often expressed the intention that they should share equally (here had made and carefully preserved a will so providing), made without the advice of a wholly disinterested person, the making of which was concealed from the other children and made when the maker was senile and irrational (according to plaintiffs' evidence) and shown to be easily induced to act on the suggestion of others. (See Bohnsack v. Hanebrink, Mo.Sup., 240 S.W.2d 903 and cases cited.) This was not the situa-

tion in the cases on which defendant relies; in none of them was there activity by the beneficiary in the making of the will such as is shown here. Moreover, after the will was made defendant's conduct changed. He paid testator nothing for rent for subsequent years, used the annual proceeds to make extensive improvements on the land he was to get, and did not even have an income tax return made for testator, showing anything coming to him from the farms; in fact, acting as though these farms were already his. Although he said he did not know what was in the will, he carried out its terms by personally paying debts and funeral expenses before the will (in the custody of the bank) was opened. Defendant said that the matter of his getting the two farms was many times referred to by the testator. Whether this was testator's idea or defendant's own, was a question for the jury under the facts and circumstances of this case, at least from the view of the evidence most favorable to plaintiffs. We hold there was substantial evidence of undue influence and that the court properly submitted this issue to the jury.

■ Defendant alleges error in permitting lay witnesses, over his objection, to express an opinion as to the unsoundness of testator's mind. Defendant says these witnesses did not testify to facts upon which such an opinion could be based, claiming that the facts to which they testified were not inconsistent with a sound mind, citing in addition to the other cases hereinabove cited, Kaechelen v. Barringer, Mo., 19 S.W.2d 1033 and Buchholz v. Cunningham, 340 Mo. 302, 100 S.W.2d 446; see also Pickett v. Cooper, supra, 192 S.W. 2d loc.cit. 416. As stated in the latter case, the propriety of allowing a lay witness to express such an opinion depends upon his opportunity to observe testator and his statement of the facts observed. Our ruling herein, that there was substantial evidence on the issue of mental incapacity, was based in part on the view that there was testimony by these lay witnesses of facts inconsistent with a sound mind. Their opportunity of observation was ample, including a

period of years prior to the senile condition related. Therefore, we hold there was no error in permitting these witnesses, after stating such facts, to express an opinion as to the soundness of testator's mind.

Defendant alleges error in giving instruction No. 1, on burden of proof, on the ground that it put a greater burden on defendant than the law requires, citing Rasp v. Baumbach, Mo.Sup., 223 S.W.2d 472; Pulse v. Jones, Mo.Sup., 218 S.W.2d 553; Stumpf v. Panhandle Eastern Pipe Line Co., 354 Mo. 208, 189 S.W.2d 223; Johnson v. Dawidoff, 352 Mo. 343, 177 S.W.2d 467; Seago v. New York Central Ry. Co., 349 Mo. 1249, 164 S.W.2d 336, 147 A.L.R. 372; Krause v. Spurgeon, Mo.App., 256 S.W. 1072; see also Wilt v. Moody, Mo. Sup., 254 S.W.2d 15. Instruction No. 1 was as follows: "The Court instructs the jury that the burden of proof is upon the defendants to show that the paper writing offered in evidence as the will of Henry Machens was executed by the said Henry Machens as and for his will, and that at the time of the execution thereof he was of sound and disposing mind and memory; that is to say, the burden is upon the defendants *to show to the jury by a preponderance of the evidence and to your satisfaction* that at the very time Henry Machens signed the alleged will he had mind and memory enough to understand that he was making a will disposing of all his property, to take effect at his death, the value, extent and nature of his property, the number and names of the persons who were the natural objects of his bounty, and his relations to them, and their situation in life, and, further, that at such time he had active memory enough to retain all these facts in his mind while the said will was being framed. And, unless the defendants *have proven to your satisfaction by a preponderance of the evidence* that at the time Henry Machens signed the alleged will he had such a mind and memory, then your verdict should be against the alleged will."

The Court also gave instruction No. 2 as follows: "The Court instructs the jury that, in determining the issues of the sufficient soundness of mind, and testamentary capacity possessed by said Henry Machens to make a will, *you must believe from a preponderance of the evidence* that, at the time of the signing and execution thereof, the said Henry Machens had sufficient understanding to comprehend the nature of the transaction that he was then engaged in, the nature and extent of his property, and to whom he desired to and was giving it, without the aid of any other person, and, unless the defendant *has shown by such preponderance of evidence* that he did possess all these requisites, you should find that the paper writing introduced in evidence is not the will and testament of the deceased, Henry Machens." (All italics ours.)

Instruction No. 2 correctly states the burden of proof, while instruction No. 1 goes beyond it by introducing the additional requirement of "satisfaction." During the last ten years, we have frequently and continuously condemned (in the above cited cases and others) the use of this term in burden of proof instructions. We have pointed out also that it has been condemned in other states. Seago v. New York Central, supra, 164 S.W.2d loc.cit. 341; State v. Barton, 361 Mo. 780, 236 S.W.2d 596. However, we have not yet directly held that it is reversible error and reversed a judgment on that ground.

In Pulse v. Jones, supra, 218 S.W.2d loc.cit. 557, we held it was not error for an instruction to state: "before plaintiff can recover under the charge of negligence, the charge must be sustained by the preponderance, that is, the greater weight of the credible evidence to the reasonable satisfaction of the jury." We said that so qualified and used (in connection with "preponderance" and "greater weight of the credible evidence") these words "require no more than that the jury believe that the evidence adduced by plaintiff is more convincing than the evidence adduced by defendant." We have said, in Johnson v. Dawidoff, supra, 177 S.W.2d loc.cit. 472 and Rasp v. Baumbach, supra, 223 S.W.2d loc. cit. 474, where the instructions involved used both phrases ("to the satisfaction" and "to the reasonable satisfaction"), if the trial court granted a new trial on the ground

that the use of both phrases was so misleading as to be prejudicial in the particular case, we would defer to that ruling.

■ We cannot approve instruction No. 1, although it was once approved by this Division in Andrew v. Linebaugh, supra, 260 Mo. loc.cit. 658. We certainly have sufficiently warned the bench and bar against inserting such phrases in burden of proof instructions. Nevertheless, our duty to the litigants involved requires us to determine whether or not the giving of this instruction was prejudicial error in this case. Section 512.160 RSMo 1949 V.A.M.S. We have often stated the rule that, whether an instruction "was misleading depends upon how it would be understood by a jury composed of ordinarily intelligent laymen when read in connection with all of the other instructions in the case." Mueller v. Schien, 352 Mo. 180, 176 S.W.2d 449, 453. That case also involved a "satisfaction" instruction and we held that under the circumstances of the case and in connection with other instructions it "could [not] have misled the jury to appellant's prejudice." In Schultz v. Schultz, 316 Mo. 728, 293 S.W. 105, 109, an instruction was given, which this Court said "was error—plain and unadorned." However, in holding the error not prejudicial, we said: "The most that can be said of its possible prejudicial effect is that, when read in connection with the other two instructions, it may have tended to so confuse and mystify the lay minds of the jurors that they were unable to tell who had the burden of proof. It is an ancient dogma of appellate practice that all error is presumed to be prejudicial, and the doctrine has never been cast into the discard by this court through any formal pronouncement. Nevertheless, we have in recent years, in conformity with both the letter and spirit of what is now Section 1513, R.S.1919, (now 512.160) refused to reverse judgments unless the appellant or plaintiff in error was able to show not only that error had been committed, but that the error was one 'materially affecting the merits of the action.' From a careful consideration of the record as a whole it does not appear to us that appellants were prej-

udicially affected by the giving of the instruction under review."

■ Instructions, of course, must be read together as an entire charge. After reading instructions No. 1 and No. 2, would the jury make a distinction (which would materially affect the merits of the action) between "have proven to your satisfaction by a preponderance of the evidence" and "you must believe from a preponderance of the evidence?" Reading these instructions together, they emphasize the burden of proof as requiring findings based on a preponderance of the evidence and should be so understood by the jury. We think the situation here is so similar to that considered in Rasp v. Baumbach, supra, as to require the same ruling. While such an instruction, containing these "satisfaction" phrases should not be given, we do not think we can hold it prejudicial under the circumstances of this case and in connection with the entire charge. The verdict of the jury was unanimous. This matter was specifically set out with particularity in the motion for new trial so that this ground of error was presented to the trial court in considerable detail. The trial court did not find it prejudicial or misleading and overruled the motion. From our review of the whole record, we do not feel that we should reverse this judgment solely because of instruction No. 1, considering the burden of proof submission as a whole, and we, therefore, overrule this assignment.

■ Defendant alleges error in giving instructions No. 4 and No. 5. The only contention made as to instruction No. 5 (which is also made as to instruction No. 4) is that it authorizes a verdict for plaintiffs on the ground of undue influence when "there was no evidence in the case upon which to base such an instruction." What we have hereinabove ruled on the propriety of the submission of this issue is decisive of this contention. The main complaint against instruction No. 4 is that no facts were hypothesized "from which the jury could determine whether there was or was not undue influence exerted"; and that it "was a roving commission to the jury." This in-

struction told the jury some of the things they could take into consideration, such as the relation of the parties to the deceased, the unequal distribution of his property, what took place at the time the will was made, and his feelings toward his children; and it contained another clause which defendant says makes it erroneous, namely: "and if, from all the facts and circumstances in evidence in the case, the jury shall find that the will was procured by the undue influence of defendant, Andrew Machens, then they will find for plaintiffs." See instruction No. 5 in Gordon v. Burris, 153 Mo. 223, loc.cit. 234, 54 S.W. 546; and also instruction No. 4 in Munday v. Knox, 321 Mo. 168, 9 S.W.2d 960, loc.cit. 965. Defendant relies on Yates v. Manchester, 358 Mo. 894, 217 S.W.2d 541, and other cases, such as Stanich v. Western Union Telegraph Co., 348 Mo. 188, 153 S.W.2d 54, requiring hypothesization of facts in verdict directing instructions. However, instruction No. 5 herein did fully cover the issue of undue influence and defendant finds no fault with what it hypothesized. Of course, these two instructions must be read together in determining whether this issue was properly submitted. Moreover, we have overruled Yates v. Manchester, supra, in so far as it is applicable to defendant's contention herein and recognized that counsel for both parties have some duties concerning the correctness of the trial court's instructions. In Hooper v. Conrad, Mo.Sup.Banc, 260 S.W.2d 496, loc. cit. 501, we said in overruling the Yates case "that if either of the parties deems a hypothesized fact or situation not to have been clearly or sufficiently hypothesized in any instruction, he should offer a clarifying or amplifying instruction." Defendant did offer instruction H on this issue, which was given and which clarified the submission of this issue favorably to his contentions. Therefore, the assignments as to these instructions are overruled.

Defendant also makes allegations of error as to making Father Edward Schlattmann, (hereinafter referred to as the pastor), Pastor of the St. Francis Catholic Church of Portage des Sioux, a party defendant herein. Defendant says the pastor was a necessary party but was never actually made a party; and that all orders with reference to making him a party were void. Plaintiffs concede the pastor was a necessary party and while the trial was in progress, they filed a motion to permit them to amend their petition and make him a party defendant, to which his entry of appearance was attached. However, the entry of appearance was withdrawn, when defendant objected to it, because the pastor had consented to have it filed only if all parties agreed. The motion to make him a party was then overruled. Thereafter, another motion was filed asking leave to file an amended petition making the pastor a defendant and plaintiffs also paid into court the $25 provided for him by the will, to be paid to him unconditionally regardless of the result of the case. However, before this second motion was considered, the court set aside its previous order overruling the first motion and ordered the motion sustained. The Court also ordered the pastor's name inserted in the petition by interlineation. The effect of the previous entry of appearance being questioned, a summons to the pastor was issued and he filed an answer stating that he was the pastor described in the will and had no other interest in the case.

Without lengthening this already long opinion by detailing defendant's contentions, which we find to be without merit, we rule that the court had authority to and properly did set aside its previous order (made the week before) denying plaintiffs' motion to make the pastor a party and to order him made a party. Since the court's action was what plaintiffs wanted and acted upon, their second motion for leave to file an amended petition may be considered withdrawn and their first motion considered as renewed. During a hearing before a court in session, it is not even necessary to have a written motion. Section 509.280 RSMo 1949, V.A.M.S. Defendant's cases concerning abandoned pleadings, therefore, are not applicable, namely, State ex rel. Wright v. McElhinney, Mo.App., 72 S.W.2d 895; Cammann

734

v. Edwards, 340 Mo. 1, 100 S.W.2d 846; State ex inf. McKittrick ex rel. Martin v. Stoner, 347 Mo. 242, 146 S.W.2d 891; Locasio v. Ford Motor Co., 240 Mo.App. 269, 203 S.W.2d 518. In any event, when the court ordered the pastor made a party at plaintiffs' request, as it was authorized to do under Section 507.030 RSMo 1949, V.A. M.S.; and, after summons having been issued he filed an answer, he became a party for all purposes and we so hold. Although the interlineation adding his name was never written on the petition (in attempting to do that when the court so ordered, it was written on another pleading in the file by inadvertence) his interest appeared therefrom because the will was set out in full therein and his answer identified him as the intended pastor. Since defendant made no such objection at the time, the petition should be considered as amended in accordance with the court's order.

■ Neither is there any merit in defendant's final contention that, by their motion tendering $25 to the pastor and depositing same in court, they adopted the will so that defendant became entitled to a directed verdict. Defendant cites cases holding that one cannot claim under a will and against it too; and that acceptance of a beneficial interest under a will is an adoption of the whole will, such as In re Bernay's Estate, 344 Mo. 135, 126 S.W.2d 209, 122 A.L.R. 169; Colvin v. Hutchison, 338 Mo. 576, 92 S.W.2d 667, 105 A.L.R. 266; and Wood v. Conqueror Trust Co., 265 Mo. 511, 178 S.W. 201. However, the fallacy of defendant's argument is that plaintiffs did not claim anything under the will, or accept anything under it, but instead they paid out their own money. Paying is certainly not receiving. It is true that this payment was for a purpose stated in the will but there is no reason why plaintiffs could not use their own money for any purpose they desired whether stated in the will or not. We hold this was not an adoption of the will.

The judgment is affirmed.

All concur.

**On Motion for Rehearing or to Transfer to the Court en Banc.**

■ Defendant's motion reargues the evidence as though we reviewed a jury case on the basis of a trial de novo; and complains because the opinion does not set out certain evidence favorable to him. Defendant completely ignores the real situation, namely, that the jury decided the fact issues against him. Nothing in our jurisprudence is more firmly established than the rule that a jury's verdict is final (and not reviewable) on the fact issues, if its findings are supported by substantial evidence, and that our review of that question is limited to determining whether the evidence, considered most favorably to the result reached by the jury, is substantial evidence from which the jury could reasonably reach the result it did. See West's Missouri Digest, Appeal and Error, ☞☞930, 989, 999, 1001, 1002 and 1003. Of course, in this case, the jury could have taken a different view (and there was much evidence to support a different view) but, since there was substantial evidence to support the verdict, conflicting evidence is wholly immaterial on the issues (submissibility of mental incapacity and undue influence) presented for our decision on this appeal.

Defendant argues at length about our ruling that there was no error in permitting lay witnesses (testator's sons and daughter and neighbors) to express opinions as to the unsoundness of testator's mind after stating facts upon which their opinions were based. In the motion, defendant complains that, in making this ruling, the opinion did not set out the facts to which these witnesses testified. Defendant entirely overlooks our statement of facts, made in connection with our ruling on his contention that there was no substantial evidence to submit the issue of mental incapacity, wherein we set out in considerable detail the facts to which these witnesses testified. It certainly was unnecessary to repeat this.

■ Also in this connection it should be pointed out that defendant's only assign-

ment as to this matter was as follows: "The court below erred in permitting lay witnesses, over the objection of defendant, to express an opinion to the soundness of Henry Machens' mind when such witnesses did not testify to facts upon which such an opinion could be based. The facts testified to by such lay witnesses were not inconsistent with a sound mind and the court erred in permitting such witnesses to give it as their opinion that Mr. Machens was not of sound mind." There was no assignment whatever directed at the testimony of any particular witness or at any specific ruling of the Court or any reference to any particular place in the record. Such a general allegation of error is insufficient to present anything more than the question of whether, in the testimony of lay witnesses on the issue of mental incapacity, there was substantial evidence to support the verdict.

Defendant's other contentions only reargue the questions decided and are without merit. The motion for rehearing or to transfer to Banc is overruled.